Dorothy GRAY, Widow of Eugene Gray, Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR; Riverton Coal Company, Respondents.

No. 90–1795.

United States Court of Appeals, Fourth Circuit.

Argued March 6, 1991.

Decided Sept. 4, 1991.

Raymond Thomas Reott, Jenner & Block, Chicago, Ill., for petitioner.

Douglas Allan Smoot, Jackson & Kelly, Charleston, W.Va., for respondents.

Before MURNAGHAN and NIEMEYER, Circuit Judges, and BRITT, District Judge for the Eastern District of North Carolina, sitting by designation.

## OPINION

NIEMEYER, Circuit Judge:

In denying black lung benefits to the claimant in this case, the Administrative Law Judge (ALJ) weighed conflicting interpretations of X rays, conflicting blood gas studies, and other evidence and concluded that the evidence was insufficient to satisfy or "invoke" a statutory presumption of entitlement to benefits. The Benefits Review Board affirmed, and on appeal the claimant contends that the ALJ improperly considered X-ray rereadings in violation of 30 U.S.C. § 923(b) and improperly applied a "later evidence rule" to discount an earlier qualifying blood gas study. In this case of first impression, we interpret § 923(b) to limit only the use of X-ray rereadings procured by the "Secretary" and not those offered by private employers. Because the ALJ properly considered X-ray rereadings offered by the mine operator and properly evaluated the blood gas studies, we deny the claimant's petition for review and affirm the order of the Board.

### I

Eugene Gray began work in the coal mines in 1927 after having finished the tenth grade. He continued working on and off in the mines until April 1978. For 19 years during this period he worked as an underground coal miner, and for the last 18 months he worked as an employee of the Riverton Coal Company in West Virginia. After he quit working for Riverton in 1978, he worked on odd jobs until his death in May 1983.

On April 20, 1978, Gray filed a claim for black lung benefits with the Department of Labor. After the Department of Labor initially denied his claim, Gray requested a formal hearing before an ALJ. Before that hearing, however, Gray died and his widow, Dorothy Gray, pursued a survivor's claim. (For convenience we refer to Gray

and his widow by "Gray" or the "claimant.")

In presenting his claim, Gray sought to invoke the rebuttable interim presumption under 20 C.F.R. § 727.203(a) that he was totally disabled due to pneumoconiosis. Having satisfied the requirement of having worked ten years in coal mine employment, he sought to invoke the presumption by offering evidence in the form of X rays, ventilatory studies, blood gas studies, and medical opinions. The evidence included three X rays, one of which was taken on October 16, 1981, and was interpreted as positive for pneumoconiosis by Dr. Maurice Bassali. This same X ray was reread as "completely negative" for pneumoconiosis by four other doctors retained by Riverton. The other two X rays were both interpreted as "completely negative." The evidence also included one qualifying blood gas study and one nonqualifying. By weighing the conflicting evidence of each type, the ALJ found that Gray failed to invoke the interim presumption under § 727.203(a) or the presumption under 20 C.F.R. Part 410, Subpart D.[1]

Following the ALJ's decision of July 8, 1985, denying benefits, the decision in *Stapleton v. Westmoreland*, 785 F.2d 424 (4th Cir.1986) (*en banc*), was issued. That decision held that the interim presumption is invoked where there is "credible evidence that *a qualifying X-ray* indicates the presence of pneumoconiosis ... or *a single qualifying set of blood gas studies* indicates, pursuant to the regulatory standard, an impairment in the transfer of oxygen from the lungs to the blood." 785 F.2d at 426 (emphasis added). Concluding that *Stapleton* established a standard different from that used by the ALJ, the Benefits Review Board remanded Gray's case to the ALJ to consider evidence in light of the new standard.

On remand, the ALJ concluded in a second decision that under *Stapleton* the interim presumption was invoked by the single positive interpretation of the X ray and

by the single blood gas study but that the presumption was rebutted by Riverton. The ALJ found that Gray did not "suffer from pneumoconiosis and his chronic pulmonary disease, which was not coal mine related, was not disabling." Summarizing the evidence, the ALJ observed that "evidence concerning claimant's medical condition was submitted by approximately ten doctors" and "only one of these doctors [Dr. Bassali] was willing to conclude claimant had any sign of pneumoconiosis."

Following the ALJ's second decision, the Supreme Court reversed *Stapleton* in *Mullins Coal Co., Inc. v. Director, OWCP*, 484 U.S. 135, 108 S.Ct. 427, 98 L.Ed.2d 450 (1987), holding that the ALJ, in determining whether the presumption has been invoked, must weigh the quality and quantity of all X rays (as well as other evidence permitting invocation of the presumption) and that the ALJ need not accept one positive interpretation of the X ray and ignore other conflicting interpretations. In light of *Mullins*, on May 11, 1990, the Board vacated the ALJ's second decision to the extent that the invocation of the interim presumption was based on the standard enunciated in *Stapleton* and reinstated the ALJ's original decision of July 8, 1985, which weighed the evidence in determining whether the presumption had been invoked. Gray now appeals that decision of the Board.

On appeal Gray contends that the ALJ's finding that the interim presumption had not been invoked was erroneous because the ALJ (1) improperly relied on negative *rereadings* of X rays submitted by Riverton in violation of 30 U.S.C. § 923(b) (addressing the kind and quality of evidence needed to support a claim), and (2) improperly relied on the later blood gas study and rejected the earlier by applying a "later evidence rule." Gray also challenges the ALJ's findings made in his second decision that Riverton rebutted the interim presumption and the legal standards applied by the ALJ in making those findings.

---

1. The Benefits Review Board notes the requirement that the ALJ consider 20 C.F.R. § 410.490 if entitlement is not established under § 727.-

203. J.A. 5, *citing Pittston Coal Group v. Sebben*, 488 U.S. 105, 109 S.Ct. 414, 102 L.Ed.2d 408 (1988).

## II

In weighing the X-ray evidence to conclude that Gray did not invoke the presumption that he was totally disabled due to pneumoconiosis, the ALJ considered rereadings of an X ray taken on October 16, 1981, together with the interpretation of that X ray offered by Gray. Although the interpretation offered by Gray concluded that the X ray was positive for the presence of pneumoconiosis, Riverton presented the interpretations of four other doctors, all B-readers[2], and one who was board certified in radiology, who concluded that the X ray was "completely negative" for the presence of pneumoconiosis. Gray contends that it was error for the ALJ to have received evidence consisting of rereadings because of the language in 30 U.S.C. § 923(b), which reads in pertinent part:

> In any case ... in which there is other evidence that a miner has a pulmonary or respiratory impairment, *the Secretary shall accept a board certified or board eligible radiologist's interpretation of a chest roentgenogram* which is of a quality sufficient to demonstrate the presence of pneumoconiosis ... except where the Secretary has reason to believe that the claim has been fraudulently represented.

(Emphasis added.) Gray contends that this provision prohibits the ALJ from considering any rereadings and that therefore the ALJ erred in considering those submitted by Riverton.

Riverton contends that Gray's interpretation ignores the plain meaning of the statute, prior decisions of the Benefits Review Board, and the legislative history. It argues that if we were to exclude evidence consisting of X-ray rereadings from consideration by the ALJ when determining whether the presumption was invoked, we would circumvent the Supreme Court's decision in *Mullins*, which required a review of *all* relevant evidence under a preponderance of the evidence standard, *see* 484 U.S. at 138, 148–49, 108 S.Ct. at 429, 434–35,

and return "through the back door" to *Stapleton*, which *Mullins* reversed.

The issue of whether 30 U.S.C. § 923(b) prohibits the ALJ from receiving rereadings of X rays offered as evidence by a private operator to show that the claimant has not properly invoked the interim presumption under 20 C.F.R. § 727.203(a) has never been directly decided by the courts, although the Board has interpreted the statute on several occasions. It has consistently held that § 923(b) requires the "Secretary" to accept a positive X-ray reading in specified circumstances and thereby prohibits the Secretary from considering government-obtained rereadings, but that private employers are not precluded from obtaining and offering rereadings. *See, e.g., Tobias v. Republic Steel Corp.*, 2 B.L.R. 1–1277, 1–1286 (B.R.B.1981).

While any interpretation of a statutory provision begins with its language, *see Adams v. Dole*, 927 F.2d 771, 774 (4th Cir.1991), if the statutory language is ambiguous, the question becomes one of whether the interpretation by the agency charged with its administration is permissible. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). The judiciary, however, is the "final authority on issues of statutory construction and must reject administrative interpretations which are contrary to clear congressional intent." *Id.* at 843 n. 9, 104 S.Ct. at 2781 n. 9. When the congressional intent is not readily apparent from the language of the statute and its legislative history, traditional tools of statutory construction are employed. *Adams*, 927 F.2d at 774.

Although the language of § 923(b) provides that the "Secretary" must "accept" a qualified X-ray interpretation (thereby inferring that it may not accept rereadings), it fails to provide the context in which the mandate is to be applied. Because the Secretary's delegate performs varying

---

**2.** A "B-reader" is a physician who has demonstrated proficiency in classifying X rays by successful completion of an examination of the

National Institute for Occupational Safety and Health. *See* 42 C.F.R. §§ 37.51 and 37.2(b).

functions in the claim process,[3] the mandate could arguably apply to evidence offered with the claimant's initial claim, or to evidence presented to support a claim against the federal trust funds, or to the Secretary's role in evaluating claims, or even to the Secretary's role in formal adversary proceedings. While it is not clear from the face of the statutory provision to what function of the Secretary the provision was meant to apply, the more relevant question is also left unanswered: does the language, which is directed to the Secretary, also preclude private operators and claimants from offering their own independently procured and privately funded interpretations of X rays. Because we find the statutory language ambiguous, we will examine the interpretation given to the provision by the Benefits Review Board and the administering agency and evaluate whether it is permissible in light of the language of the statute and Congress' intent as revealed by legislative history.

■ We recognize that an isolated interpretation by the Benefits Review Board may not be entitled to special deference and thereby be chargeable to the position taken by the agency. *See Potomac Elec. Power Co. v. Director, OWCP*, 449 U.S. 268, 278 n. 18, 101 S.Ct. 509, 514 n. 18, 66 L.Ed.2d 446 (1980). However, an interpretation that regulates the day-to-day conduct of processing and adjudicating claims, which is applied consistently by the Board for a period of many years without objection or action by the Secretary, gives the Board's interpretation the tacit approval of the agency and may be given greater deference. *See Chevron*, 467 U.S. at 844, 104

S.Ct. at 2782 (interpretations of statutory provisions by an agency entrusted with its administration entitled to deference); *see also* Anthony, *Which Agency Interpretations Should Bind Citizens and Courts?*, 7 Yale J. on Reg. 1, 48–52 (1990) (consistent adjudicatory application of a statutory term to specific and detailed facts carries its own indicia of reasoned decisionmaking and elevates the interpretation to one which is due judicial deference under *Chevron*).

■ On the issue before us, the Benefits Review Board has consistently interpreted 30 U.S.C. § 923(b) to prohibit only use of government procured and funded rereadings, and not those obtained by private employers. In *Tobias*, after an in-depth exploration of the legislative history, the Board held that § 923(b) applied to limit actions of the Secretary when obtaining and reviewing X-ray evidence in connection with the Department of Labor's initial determination of eligibility for benefits. 2 B.L.R. at 1–1285. The Board in *Tobias* stated, "Of course, acceptance by the Secretary of such X-rays, refers to the Department's initial determination, and does not preclude any operator who may be liable for benefits from contesting the claimant's Xray evidence or from seeking other X-rays." *Id. (quoting* Senate debate and passage of the Conference Report on H.R. 4544, February 7, 1978). The practice of allowing the claimant or an employer, but not the Director, to submit rereadings was affirmed in *Pulliam v. Drummond Coal Co.*, 7 B.L.R. 1–846, 1–849 n. 2 (B.R.B.1985) (rereadings do not violate § 923(b) when obtained by an employer rather than by the Director of the OWCP), *Paladino v. Silverbrook Anthracite Co.*, 6 B.L.R. 1–1296, 1–

---

**3.** Although a claim for Black Lung benefits may be filed with an office of the Social Security Administration or an office of the Department of Labor, 20 C.F.R. § 725.303(a)(1), it is first considered substantively by a deputy commissioner, who is an official of the Division of Coal Mine Workers' Compensation (DCMWC) in the Office of Workers' Compensation Programs (OWCP) within the Department of Labor. § 725.350. The deputy commissioner makes initial findings on the claimant's eligibility and whether there is a responsible operator. § 725.-410. If the deputy commissioner determines that the claimant has demonstrated eligibility

but no responsible operator can be identified, the deputy commissioner issues a proposed decision and order and authorizes payment of benefits from public funds. § 725.411. If, however, a responsible private operator is identified, the operator is notified of the potential liability and is given an opportunity to contest its status as the responsible operator and the merits of the claim. §§ 725.412 & 725.413. When a formal hearing is requested on contested issues, the deputy commissioner refers the claim to the Office of Administrative Law Judges for a formal hearing. § 725.421.

1297 (B.R.B.1984) ("[T]he X-ray rereading prohibition of Section [923(b)] and at 20 C.F.R. § 727.206(b)(1) is directed against the Secretary, not the claimant."), and *Jones v. Freeman United Coal Mining Co.*, 3 B.L.R. 1–153, 1–156 (B.R.B.1981) (either a claimant or an employer may present rereadings). We have found no Board decision to hold to the contrary.

If Gray's interpretation, that § 923(b) prohibits consideration by the ALJ of all X-ray rereadings, were adopted, we would be altering the uniform practice followed by the agency and practitioners for over ten years and apparently understood without question by the courts. A flat prohibition against the use of X-ray rereadings would be inconsistent with the statement made by the Supreme Court in *Mullins*, "Just as the ALJ must weigh *conflicting interpretations of the same X ray* in order to determine whether it tends to prove or disprove the existence of pneumoconiosis, there would seem to be no reason why he must ignore all X rays in a series except one." 484 U.S. at 148–49, 108 S.Ct. at 434–35 (emphasis added); *see also Pauley v. Beth-Energy Mines, Inc.*, —— U.S. ——, ——, 111 S.Ct. 2524, 2526, 115 L.Ed.2d 604 (1991) (§ 923(b) prohibits "the DOL from denying a claim based on a *secondary assessment* of the X rays provided by a *Government-funded* radiologist" (emphasis added)). Likewise, the court in *Cook v. Director, OWCP*, 816 F.2d 1182 (7th Cir.1987), understood that conflicting interpretations of X rays are appropriately considered by the ALJ in determining whether the presumption has been invoked:

> Under the regulation [20 C.F.R. § 727.-203(b)] it is not the reading, but the X-ray, that establishes the presumption. If one doctor interprets an X-ray as positive for black-lung disease but 100 equally qualified doctors interpret the same X-ray as negative for the disease, nothing in the regulation requires the administrative law judge to disregard the negative readings.

*Id.* at 1185.

Moreover, the legislative history reveals, virtually without exception, the intent of Congress to limit the application of § 923(b) to restrict *governmental* attempts to frustrate the payment of claims and not to preclude evidence that may be offered by private operators in opposing claims. During the course of Congress' consideration of the Black Lung Benefits Reform bill, both House and Senate reports repeated essentially the same position, and often with the same language, that *government contract* radiologists were perceived as being used by the government to second-guess X-ray interpretations and deny benefits, a perception which, it was thought, did more to impugn the credibility of the government's administration of the program than any other factor. For example, Senate Report 95–209 (from the Committee on Human Resources) reported:

> The Committee bill requires the Secretary to accept a board certified or board eligible radiologist's interpretation of a miner's chest X-ray if the X-ray is of a quality sufficient to demonstrate the presence of pneumoconiosis....

> Both the Department of Health, Education, and Welfare and the Department of Labor have (without legislative direction) established X-ray quality control procedures under which government contract radiologists provide their own interpretations of X-rays submitted in connection with black lung claims. This procedure has elicited deep resentment among claimants, who believe strongly that the government readers are utilized solely for the purpose of denying claims.

> While the Committee does not concur in this belief, it is concerned that this procedure alone has done more to destroy the credibility of the Federal government's administration of this program among miners and widows than any other factor.

>     \*     \*     \*     \*     \*     \*

> The Department of Labor acknowledges that more than sixty percent of the X-rays which are submitted as positive for pneumoconiosis are re-read by the government's consulting radiologists as negative. As a general proposition reasonable men can differ, and this holds

true for radiographic interpretations as well as for other fields of endeavor. The imperfection of this art is also indicated in cases of miners whose X-rays were interpreted as negative and who have, on autopsy, been revealed to have suffered from varying stages of pneumoconiosis.

There is little reason, as a matter of policy, for the government to interpose panels of second-guessers, particularly where the original interpreter of a claimant's X-ray was a qualified radiologist. *Black Lung Benefits Reform Act and Black Lung Benefits Revenue Act of 1977,* published by the House Committee on Education and Labor (96th Cong., Feb. 1979) (hereinafter "Leg. Hist."), at 613–14; *see also* Leg. Hist. at 344 (Report of Senate Committee on Education and Labor); Leg. Hist. at 527 (Report of House Committee on Education and Labor); and Leg. Hist. at 888–89 (Conference Report).

The debates on the bill, which focused on the wisdom of the X-ray rereading prohibition and not on its scope, reveal the uniform understanding that the limitations of § 923(b) are intended to restrict only the government, as distinguished from claimants and private mine owners. Several senators highlighted this understanding when they complained that by imposing the restriction, the government lost its ability to defend itself and thereby control expenditures. For instance, Senator Chafee stated:

[I]t [§ 923(b)] deprives the Government of its defenses, but it does not deprive the owner of the mine of his defenses. In those instances where there is a known mineowner who employed the claimant, and the claimant comes in for his claim, in that case, there can be a rereading, a second reading, under this act, to protect the owner of the mine. To me, it is incongruous and I just do not understand it, that we are depriving the Government of a defense that we are not depriving the owner of the mine of. I suppose that, under the U.S. Constitution, we could not deprive the owner of the mine of that defense, but we are going much farther in protecting the

owners of the mine than we are the U.S. Government and the taxpayers of the United States.

Leg. Hist. at 683; see additional comments by Senator Chafee, Leg. Hist. at 681 and 718; *see also* comments of Senator Randolph, Leg. Hist. at 665, 685–86, 699–700; Senator Javits, Leg. Hist. at 675, 678; Senator Huddleston, Leg. Hist. at 679; Senator Long, Leg. Hist. at 702, 705; and Senator Garn, Leg. Hist. at 717. For similar comments made during the House debates, see comments of Representative Wampler, Leg. Hist. at 279; and Representative Hechler, Leg. Hist. at 278, 236.

After Senate and House versions of the bill were reconciled in conference, the debate on the Conference Report revealed the continued understanding that § 923(b) was not intended to apply to private employers. For instance, Senator Javits stated:

Of course, acceptance by the Secretary of such X-rays, refers to the Department's initial determination, and does not preclude any operator who may be liable for benefits from contesting the claimant's X-ray evidence or from seeking another X-ray.

Leg. Hist. at 910.

It is readily understandable why Congress would have wanted to limit the Director's practice of "shopping" for negative interpretations to deny claims in the face of a policy to pay benefits to victims of black lung disease. It challenged the credibility of the Act to provide for benefits and then permit the government, when administering it, to shop for negative X-ray interpretations to deny those benefits. The same argument cannot be made for limiting the evidence that private mine owners could muster. To the contrary, to require an employer to accept a positive interpretation of an X-ray submitted by a claimant without the ability to demonstrate that the reading may have been an error evokes a sense of unfairness that well might be challenged as violative of due process. This argument was fully appreciated by members of Congress. *See, e.g.,* comments of Senator Chafee, Leg. Hist. at 683.

After enactment of 30 U.S.C. § 923(b), the Department of Labor adopted implementing regulations at 20 C.F.R. § 727.206(b)(1). Although the language of the pertinent regulation adds little to the statutory language, the regulation requires the OWCP to accept a proper reading of an X-ray without suggesting any prohibition against the use of rereadings by claimants or private employers.

The contention urged by Gray that 30 U.S.C. § 923(b) was intended to prohibit the ALJ from receiving rereadings of X-rays offered by a private operator is simply not consistent with the repeated Board interpretations, the legislative history, and the implementing regulation. *See also* Smith & Newman, *The Basics of Federal Black Lung Litigation*, 83 W.Va.L.Rev. 763, 768–69 (1981) ("The X-ray re-reading prohibition prevents the Secretary from submitting any X-ray re-reading procured by him as evidence against the existence of [coal worker's pneumoconiosis].... However, the legislative history of the [Black Lung Benefits Reform Act of 1977] makes it clear that a coal operator may contest a claimant's proffered X-ray evidence or seek a new X-ray.").

Because the language of the statute, its legislative history, and long-standing practice confirm that the agency's interpretation is permissible, we hold that 30 U.S.C. § 923(b) does not preclude the mine operator from offering conflicting interpretations of X-rays for consideration by the ALJ in determining whether the presumption under 20 C.F.R. § 727.203(a) has been invoked. On the contrary, the ALJ must consider all the relevant evidence available and conclude whether, by a preponderance of the evidence, the presumption has been invoked. *See Mullins*, 484 U.S. at 138, 148–49, 108 S.Ct. at 429, 434–35.

### III

█ Gray also contends that the presumption of benefits was invoked by reason of a single qualifying blood gas study done on September 28, 1978, even though another study performed then and other studies performed on April 28, 1981, were nonqualifying. He argues that the ALJ credited the later studies with more weight by applying the "later evidence rule," which is based on the assumption that pneumoconiosis is a progressive and irreversible disease. Under this rule, a more recent test which is positive for pneumoconiosis would be entitled to more weight than an earlier one which was negative because it is consistent with the progressive nature of the disease, and the two tests could, for that reason, be read consistently. *Travis v. Peabody Coal Co.*, 1 B.L.R. 1–314, 1–320 (B.R.B.1977). Gray argues, however, that the rule cannot be applied, as he contends the ALJ applied it, when the more recent test is negative for pneumoconiosis and the earlier positive, because the more recent is inconsistent with the earlier in light of the progressive nature of the disease. One test must be wrong. In that circumstance, Gray contends, the ALJ must choose between two mutually exclusive pieces of evidence. Thus, he argues that when there is no reason to believe that the more recent test is the correct one, the ALJ's choice to credit that test only because it is the more recent is based on unfounded speculation and must be overturned. He contends that the rule for giving claimants the benefit of the doubt on medical issues should be applied here. *See Amax Coal Co. v. Anderson*, 771 F.2d 1011, 1015 (7th Cir. 1985) (in the absence of definitive medical conclusions, there is a need to resolve doubts in favor of survivors); *see also Petry v. Califano*, 577 F.2d 860, 863 (4th Cir.1978).

While Gray's argument assumes that the blood gas studies in 1978 and 1981 established an equally balanced standoff which the ALJ resolved by applying the later evidence rule, the record fails to support his assumption. Six blood gas studies were conducted on two separate dates: two on September 28, 1978, by Dr. John M. David, and four on April 28, 1981, by Dr. Richard M. Smith. Dr. David administered one test to Gray before exercising and one after. The one before was nonqualifying and the one after, qualifying. Dr. Richard Smith conducted four studies, one before

exercise and three while exercising—all nonqualifying. Thus, of six separate studies conducted, one was interpreted as indicating pneumoconiosis (and that perhaps by a questionable methodology[4]) and five showed nonqualifying results.

In concluding that the four studies conducted by Dr. Smith carried more weight than the two by Dr. David, the ALJ said,

> Although Dr. David's exercise blood gases in 1978 meet the standard, his resting blood gases do not, and those taken in 1981 were characterized by Dr. Richard M. Smith who administered the tests as normal. I conclude that the later testing is more indicative of claimant's present condition and accept these results.

J.A. 22.

The ALJ obviously considered *both* sets of tests and concluded that the four conducted by Dr. Smith were more indicative of Gray's condition. This analysis did not reveal two evenly balanced but conflicting results to which the ALJ mechanically applied a later evidence rule. Rather, the record reveals that the ALJ weighed the evidence, as required by *Mullins,* and elected to credit the tests which he found to be "more indicative" of Gray's condition. Because substantial evidence supports the finding, it is entitled to conclusive effect. *See Walker v. Director, OWCP,* 927 F.2d 181, 183 (4th Cir.1991).

IV

■ In determining whether the presumption under either 20 C.F.R. § 727.203 or Part 410, Subpart D, was invoked, the ALJ weighed the conflicting X-ray evidence and the conflicting blood gas studies, finding that the presumption was not invoked. Since there was substantial evidence to support the ALJ's finding, his decision will be affirmed. Because we affirm the finding that the presumption was not invoked, we need not reach the question of whether it was sufficiently rebutted. Accordingly, we deny the petition for review filed by Gray and affirm the order of the Benefits Review Board dated May 11, 1990, which vacates the ALJ's Decision and Order on remand and reinstates his decision and order of July 8, 1985.

AFFIRMED.

---

**4.** Riverton argues that exercise samples are to be drawn during, not after, exercise, 20 C.F.R. § 718.105(b); 20 C.F.R. part 410, appendix to subpart D, and that therefore the test conducted after exercise by Dr. David fails to conform with the quality standards for blood gas studies.