UNITED STATES of America,
Plaintiff–Appellee,

v.

Rodney Curtis HAMRICK,
Defendant–Appellant.

No. 92–5107.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 7, 1993.

Decided Jan. 6, 1995.

**ARGUED:** John J. Pizzuti, Camilletti, Sacco & Pizzuti, Wheeling, WV, for appellant. David Jonathan Horne, Sp. Asst. U.S. Atty., Wheeling, WV, for appellee. **ON BRIEF:** William D. Wilmoth, U.S. Atty., Wheeling, WV, for appellee.

Before ERVIN, Chief Judge, RUSSELL, WIDENER, HALL, MURNAGHAN, WILKINSON, WILKINS, NIEMEYER, HAMILTON, LUTTIG, WILLIAMS, and MICHAEL, Circuit Judges, and BUTZNER and PHILLIPS, Senior Circuit Judges.

Affirmed by published opinion. Judge LUTTIG announced the judgment of the court and wrote an opinion, in which Judges RUSSELL, WIDENER, WILKINSON, WILKINS, NIEMEYER, and WILLIAMS joined. Judge LUTTIG wrote a concurring opinion. Judge HAMILTON wrote an opinion concurring in the judgment. Chief Judge ERVIN wrote a dissent, in which Judges HALL, MURNAGHAN, and MICHAEL, and Senior Judges BUTZNER and PHILLIPS joined.

## OPINION

LUTTIG, Circuit Judge:

We *sua sponte* granted rehearing *en banc* to consider Rodney Curtis Hamrick's appeal from convictions resulting from his attempt to assassinate a United States Attorney with a letter bomb. A panel of our court reversed most of Hamrick's convictions on the grounds that the bomb was neither a "dangerous weapon" under 18 U.S.C. § 111(b) nor a "destructive device" under 18 U.S.C § 924(c)(1) and 26 U.S.C. § 5861(d)-(f). For the reasons that follow, we affirm Hamrick's convictions and his sentences.

### I.

In 1987, from state prison, appellant mailed letters threatening to murder then-President Ronald Reagan. He was charged with and later pleaded guilty to threatening the life of the President of the United States in violation of 18 U.S.C. § 871(a). For this offense, he was sentenced in July 1988 to five years imprisonment by United States District Judge William M. Kidd. *See United States v. Hamrick*, No. 88–40 (N.D. W. Va. July 22, 1988) (unreported).

While serving this sentence at the Federal Correctional Institute at Petersburg, Virginia, Hamrick built five improvised bombs. The first was determined to have been an inoperable test bomb after it was disarmed by an Army Explosive Ordinance Detail. The next four exploded, one of them seriously injuring a fellow inmate. In connection with these latter incidents, a jury convicted Hamrick of four counts each of the unlawful manufacture of an incendiary device, 26 U.S.C. § 5861(f), possession of an unregistered firearm, *id.* § 5861(d), and possession of contraband in prison, 18 U.S.C. § 1791(a)(2). He was also convicted for making a bomb threat, 18 U.S.C. § 875(c), in which he threatened to blow up the United States District Courthouse in Washington, D.C., if he were not released. In November 1990, United States District Judge Robert R. Merhige, Jr., sentenced him to ten years imprisonment. *See United States v. Hamrick*, No. 90–12 (E.D. Va. Nov. 27, 1990) (unreported).

During the time that he was in federal prison, Hamrick also committed numerous disciplinary infractions that did not result in criminal charges.[1] The most significant of these were four incidents in which he constructed improvised guns. He fired one of these guns at a fellow inmate and threatened a guard with another. He also was disciplined for making four bomb threats, threatening at various times to blow up the courthouse in Elkins, West Virginia, a United

---

1. The presentence report in the present case detailed Hamrick's misconduct while in prison. The district court adopted the factual findings of this report and, after imposing sentence, ordered the report placed under seal. There being no apparent risk that the information contained in this report would impair Hamrick's rehabilitation, and indeed there being risk to others from the unavailability of the information recited in the report, we hereby order the seal lifted to the extent it covers the information discussed herein.

Airlines flight, and the NAACP headquarters in Washington (twice), if he were not released from prison. Hamrick was also caught in possession of a letter containing a "smoke bomb," which he had addressed to then-President George Bush but had not mailed.

In April 1990, while still in federal prison for threatening the life of the President, Hamrick mailed a letter to Judge Kidd on behalf of "the Nazi Socialist Republican Party" in which he threatened to kill the judge and his family. After he was interviewed about the letter by the Federal Bureau of Investigation, Hamrick sent a second letter to Judge Kidd, in which he stated his resent-ment that the judge had reported his first letter to the FBI, and again threatened Judge Kidd's life. On the basis of these letters, a jury found Hamrick guilty in March 1991 of threatening to assault and murder a federal judge. *See* 18 U.S.C.A. § 115(a)(1)(B). Hamrick was sentenced to 51 months imprisonment for this offense, and a year later, we affirmed both his conviction and sentence. *United States v. Hamrick,* 960 F.2d 147 (4th Cir.1992) (unpublished).

Pending prosecution on this charge, from December 18, 1990, until February 14, 1991, Hamrick was incarcerated in the Ohio County Correctional Facility in Wheeling, West Virginia. While there, Hamrick constructed an incendiary bomb from items available to him inside the jail. The bomb comprised a nine-volt battery as a power source, steel wires, three butane cigarette lighters as the explosive, and an unidentified pink substance speculated to be lip balm, which was to serve as the detonator. The plastic case of one of the lighters was filed thin; the pink substance, in which the flints from the lighters had been placed, was positioned over the thin spot; and the wires, leading to the battery and an improvised switch, were run through the pink substance. Hamrick wrapped the bomb in aluminum foil and placed it in a manila envelope between a legal pad and a piece of cardboard. The bomb was designed to detonate when the legal pad was removed from the envelope and the wires of the improvised switch touched. The resulting electrical current was supposed to heat the wire and ignite the detonator, which then would melt the plastic casings of the lighters, free the butane, and ignite it. If fully effective, the bomb could have produced a 1000–degree fireball up to three feet in diameter. This fireball would have burned the skin and eyes of anyone exposed to it. If those exposed were inhaling when the bomb detonated, the fireball could have seared their lungs, possibly resulting in death.

Hamrick addressed the envelope containing the bomb to William A. Kolibash, United States Attorney for the Northern District of West Virginia, whose office was responsible for Hamrick's prosecution, wrote his own return address on the envelope and mailed it. On January 2, 1991, Kolibash received and opened the envelope at his office. The bomb scorched the packaging in which it had been mailed, but did not detonate.

Kolibash, realizing that the envelope contained a homemade bomb, fled his office. The United States Marshals, as well as agents from the Federal Bureau of Investigation and the Bureau of Alcohol, Tobacco, and Firearms were called to the scene. They immediately piled sandbags around the desk and secured the office. An Army bomb disposal expert and his commanding officer were flown to Wheeling from Chambersburg, Pennsylvania. Upon arriving, the expert ordered the evacuation of the entire wing of the building in which the United States Attorney was officed. While wearing a full-body kevlar bomb suit and a kevlar helmet with an inch-thick Plexiglas shield, he X-rayed and examined the bomb. After covering it with a bomb blanket, he finally dismantled it by attaching a hook-and-line set to the bomb and, from thirty feet away and down a flight of stairs, pulling the bomb's components apart.

Immediately after Kolibash had received the bomb, and before it had been dismantled, two FBI agents, after advising Hamrick of his *Miranda* rights and receiving from him a signed written waiver of those rights, interviewed Hamrick at the Ohio County Jail to determine whether the bomb would explode. Hamrick admitted to the agents that he intended the bomb to detonate within minutes of the envelope being opened. He also stat-

ed that he mailed the bomb to Kolibash in retaliation for the pending prosecution. Hamrick then signed a written statement, prepared by one of the agents, in which he admitted constructing and mailing the bomb. He later sent to the United States Marshal a copy of a letter he had written to the West Virginia American Civil Liberties Union in which he again admitted involvement in sending the bomb to Kolibash.

Hamrick was charged with the unlawful making of a destructive device, 26 U.S.C. § 5861(f) (Count I); unregistered possession of a destructive device, *id.* § 5861(d) (Count II); unlawful transfer of a destructive device, *id.* § 5861(e) (Count III); mailing of a non-mailable article, 18 U.S.C. § 1716 (Count IV); attempted murder of a federal officer, *id.* § 1114 (Count V); use of a destructive device during and in relation to the attempted murder of a federal officer, *id.* § 924(c)(1) (Count VI); assault of a federal officer with a dangerous or deadly weapon, *id.* § 111(b) (Count VII); and use of a destructive device during and in relation to the assault of a federal officer, *id.* § 924(c)(1) (Count VIII).[2]

A jury found Hamrick guilty on all counts and the district court sentenced Hamrick to 210 months imprisonment on the convictions for attempted murder and mailing of a non-mailable article, and to concurrent 120–month sentences for assault with a deadly or dangerous weapon and for the unlawful manufacture, transfer, and possession of a destructive device. The district court also imposed the mandatory sentence of thirty years imprisonment for the section 924(c) violations, to run consecutively to Hamrick's other sentences.

A panel of this court reversed Hamrick's conviction on count VII on the ground that the dysfunctional bomb was not a deadly or dangerous weapon. It reversed his convictions on counts I–III, VI, and VIII on the grounds that, as constructed, the bomb was dysfunctional and therefore not a destructive device. *See United States v. Hamrick*, 995 F.2d 1267 (4th Cir.1993) (*"Hamrick I"*). The United States, at the direction of the Solicitor General, did not petition either for rehearing or for rehearing *en banc* of the panel's reversal of Hamrick's convictions and sentences on these counts.

By Order of August 20, 1993, we *sua sponte* granted rehearing *en banc*. We now affirm Hamrick's convictions and sentences in their entirety.

## II.

■ The panel, apparently on a finding of "plain error," reversed Hamrick's conviction for assault of a United States Attorney with a deadly or dangerous weapon under 18 U.S.C. § 111(b),[3] reasoning that, because the bomb could not explode, it could not, as a matter of law, be a deadly or dangerous weapon. *Hamrick I*, 995 F.2d at 1272. We reject this reasoning and affirm *en banc* Hamrick's assault conviction.

Hamrick did not advance before the panel the argument that the bomb he sent to Kolibash was not a "dangerous" or "deadly" weapon within the meaning of section 111(b). Nor does he advance this argument before the court sitting *en banc*. Indeed, Hamrick's counsel candidly conceded at argument before the full court that the bomb was a

---

2. Hamrick's criminal activities at the Ohio County Jail did not end with his attempt to murder the United States Attorney. On February 12, 1991, Hamrick, brandishing what appeared to be a small caliber pistol, attempted to escape. His attempt ended only when a deputy sheriff ordered him, at gunpoint, to drop the pistol. The pistol was a fake, constructed from toilet paper and duct tape. Hamrick later pleaded guilty to attempted escape, 18 U.S.C. § 751(a), and was sentenced to five years imprisonment, the sentence to run concurrently with those imposed for the attempted bombing. *United States v. Hamrick*, No. 91–55 (N.D. W. Va. Jan. 28, 1992) (unreported). *See also infra* note 3.

3. The assault of a federal officer statute, 18 U.S.C. § 111, provides in relevant part:

 **(a) In general.**—Whoever—
 (1) forcibly assaults, resists, opposes, intimidates, or interferes with any person designated in [18 U.S.C. § 1114] while engaged in or on account of the performance of official duties;
 . . . .
 shall be fined under this title or imprisoned not more than three years, or both.
 **(b) Enhanced Penalty.**—Whoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon, shall be fined under this title or imprisoned not more than ten years, or both.

dangerous weapon under existing Supreme Court precedent, and in particular under *McLaughlin v. United States,* 476 U.S. 16, 106 S.Ct. 1677, 90 L.Ed.2d 15 (1986). We believe that counsel was correct to concede this point.

In *McLaughlin,* a unanimous Supreme Court held, in an opinion that was barely two pages long, that an *un* loaded handgun used to commit an assault during a bank robbery is a "dangerous weapon" under 18 U.S.C. § 2113(d), the federal bank robbery statute.[4] The Court concluded that "[t]hree reasons, *each independently sufficient* " supported its conclusion:

> First, a gun is an article that is typically and characteristically dangerous; the use for which it is manufactured and sold is a dangerous one, and the law may reasonably presume that such an article is always dangerous even though it may not be armed at a particular time or place. In addition, the display of a gun instills fear in the average citizen; as a consequence, it creates an immediate danger that a violent response will ensue. Finally, a gun can cause harm when used as a bludgeon.

*McLaughlin,* 476 U.S. at 17–18, 106 S.Ct. at 1678 (footnote omitted) (emphasis added). This reasoning applies with the same force to 18 U.S.C. § 111(b), the assault of a federal officer statute under which Hamrick was convicted. *See United States v. Gometz,* 879 F.2d 256, 258–59 (7th Cir.1989) ("Although the *McLaughlin* case interpreted 18 U.S.C. § 2113, we think that its logic applies to § 111, given that the two provisions contain identical language and are cross-referenced."), *cert. denied,* 493 U.S. 1033, 110 S.Ct. 752, 107 L.Ed.2d 768 (1990). *McLaughlin* dictates what common sense

would confirm, namely, that the bomb sent to Kolibash by Hamrick was a "dangerous weapon" within the meaning of section 111(b).[5]

Two of the Court's rationales in *McLaughlin*—the first and the second—are specifically applicable to the case before us. As to the first of these rationales, the question obviously is not whether a dysfunctional bomb is typically and characteristically dangerous, or even whether the combination of parts constituting the bomb sent by Hamrick (assuming they exist elsewhere) is typically and characteristically dangerous, no more so than the question in *McLaughlin* was whether an unloaded handgun is typically dangerous. Rather, the question is whether a bomb is typically and characteristically dangerous. Of course it is, and the use for which it is produced is a dangerous one. Thus, the law may presume, as it may with respect to a handgun, that a bomb is always dangerous even though, due to the fortuity of malfunction, faulty construction, or defective design, it may in a particular case be incapable of inflicting injury. *See Gometz,* 879 F.2d at 259 (zip gun was dangerous weapon, although because of design defect it could not expel metal fragments as intended).

Of course, the presumption that the bomb sent by Hamrick was dangerous was fully warranted, even though the bomb appears to have been dysfunctional. *See infra* at 882–883, n. 8–9 (citing cases); *cf. United States v. Rushcamp,* 526 F.2d 1380, 1382 (6th Cir. 1975) (rocket launcher with dysfunctional firing mechanism a destructive device); *United States v. Tankersley,* 492 F.2d 962, 966 (7th Cir.1974) (paint-remover filled bottle with dud firecracker detonator was destructive device); *United States v. Greer,* 404 F.Supp.

---

4. 18 U.S.C. § 2113(d) provides:
 Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy of life any person by use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both.

5. There is no question that Hamrick was convicted under the "dangerous weapon" prong of section 111(b). Other than the district court's judgment form, which uses the abbreviated descrip-

tion of the count, "Assault on U.S. Attorney with a deadly weapon," J.A. at 442, there is no support whatsoever for a contrary conclusion. The jury instructions tracked section 111(b) precisely, using the phrase "deadly *or* dangerous weapon," *id.* at 375; the indictment, J.A. at 11, and the jury verdict form, *id.* at 387, both read "deadly *and* dangerous weapon." The presentence investigation report describes the count as "Assault with a Dangerous Weapon," *id.* at 448. The jury was not instructed on the meaning of either "dangerous" or "deadly."

1289, 1293 (W.D. Mich.1975) (collection of blasting materials a destructive device even though no power source), *aff'd,* 588 F.2d 1151 (6th Cir.1978). At trial, the government's two experts testified that the inflammable butane contained in the lighters, if released and ignited, could have produced a large 1000–degree fireball capable of killing persons exposed to its heat. One of these experts, Warren Parker, testified that a nine-volt battery by itself could have easily generated enough heat to have melted the plastic casing of the lighters, liberating the butane within and creating an explosive cloud which could have been detonated by even the smallest spark.[6] And they both testified that the substitution of other substances readily available to Hamrick inside the Ohio County Jail (such as hamburger grease or matchheads) for the pink substance actually used in the bomb or some other slight modifications in the bomb's design (such as adding additional batteries or using thinner wire) would have rendered it fully operable.

As to the second of the *McLaughlin* rationales, the display of a bomb, like the display of a gun, instills fear in the average citizen, whether or not it is actually capable of inflicting injury. That this is so is amply borne out by the reaction to the bomb received by United States Attorney Kolibash. The Unit-

ed States Attorney fled his office in fear and summoned the United States Marshals, the FBI, and the ATF. The United States Attorney's office was sandbagged and an Army bomb disposal expert was flown in from another state. The bomb disposal expert thought the risk of serious injury sufficiently serious to wear a bomb suit to examine the device and, even after examining it, to dismantle it by remote means.

"Congress regarded incitement of fear as sufficient to characterize an apparently dangerous article (such as a wooden gun) as 'dangerous' within the meaning of [§ 2113(d) ]." *McLaughlin,* 476 U.S. at 18 n. 3, 106 S.Ct. at 1678 n. 3 (citing 78 Cong. Rec. 8132 (1934)).[7] So too for the same reason is a bomb which, unbeknownst to its recipients is inoperable, "dangerous" within the meaning of section 111(b). Every circuit court to address this or a similar issue has held accordingly. *See Gometz,* 879 F.2d at 259 (dysfunctional zip gun instills fear and is therefore dangerous); *United States v. York,* 830 F.2d 885, 891 (8th Cir.1987) (broken pellet gun a dangerous weapon under § 2113(d)), *cert. denied,* 484 U.S. 1074, 108 S.Ct. 1047, 98 L.Ed.2d 1010 (1988).[8] Indeed, every circuit court considering even the question of whether a fake weapon that was never intended to be operable has come to the same conclusion.

---

**6.** Parker testified that the plastic casing of the lighters would start to soften at 300 degrees Fahrenheit, and would run like melted candle wax at approximately 350 degrees. J.A. at 206, 209, 218. He stated that that "temperature could easily be attained by a dead short across a 9–volt battery with the type of steel wire involved here." *Id.* at 206. And the defense expert, Patrick Kennedy, testified that in his reconstructed bombs, the wire reached 428 degrees Fahrenheit, *id.* at 291, 294, and in one case melted polyethylene, *id.* at 293. Parker further testified that because the butane inside the lighters was under pressure, "merely weakening the walls [of the lighters] enough to allow that [butane] to vent would act as a mechanism for the function of this bomb." *Id.* at 207. He continued that once released from the lighters, the butane would "affect somewhere from 10 to 50 times the volume of air around it creating an explosive atmosphere. So that all you need then is a small spark...." *Id.* at 208.

**7.** *See also United States v. Benson,* 918 F.2d 1 (1st Cir.1990):

The debate surrounding the adoption of what is now section 2113 evinces congression-

al concern for the dangerousness of the *effects* of the robber's use of a device, not merely the inherent dangerousness of the device. *See* 78 Cong. Rec. 8132 (1934) (provision would cover use of a bottle of water which robber claimed to be nitroglycerin); *see also Martinez–Jimenez,* 864 F.2d 664, 667 (9th Cir.1989).

*Id.* at 3 n. 5; *id.* at 3 ("The dangerousness of an instrumentality ... is not necessarily determined simply by its inherent capacity to inflict harm, but by the dangerousness of the response it may reasonably be expected to provoke on the part of persons who perceive that the instrumentality is dangerous.") (citing *McLaughlin,* 476 U.S. 16, 106 S.Ct. 1677; footnote omitted).

**8.** *Cf. United States v. Paulk,* 917 F.2d 879, 882 (5th Cir.1990) (inoperable gun a dangerous weapon under Guidelines); *United States v. Luster,* 896 F.2d 1122, 1128–29 (8th Cir.1990) (same); *United States v. Smith,* 905 F.2d 1296, 1300 (9th Cir.1990) (same); *United States v. Burke,* 888 F.2d 862, 869 (D.C.Cir.1989) (same); *United States v. Laughy,* 886 F.2d 28, 30 (2d Cir.1989) (same).

*See United States v. Spedalieri,* 910 F.2d 707, 709 (10th Cir.1990) ("fake bomb, as a matter of law, may constitute a dangerous weapon [under section 2113(d) ], regardless of its actual capabilities, when a victim confronted with it is placed in reasonable expectation of danger"); *United States v. Marx,* 485 F.2d 1179, 1185 (10th Cir.1973) (fake bomb, because it placed victim in reasonable expectation of death or serious injury, was a dangerous weapon under section 2113(d)), *cert. denied,* 416 U.S. 986, 94 S.Ct. 2391, 40 L.Ed.2d 764 (1974); *cf. United States v. Boyd,* 924 F.2d 945, 947–48 (9th Cir.) (road flare, which appeared to be dynamite, a dangerous weapon under Guidelines), *cert. denied,* 502 U.S. 828, 112 S.Ct. 98, 116 L.Ed.2d 70 (1991).[9] The same conclusion has been reached even in circumstances where there was no weapon at all—fake or otherwise—but only apparently a weapon. *See United States v. Benson,* 918 F.2d 1, 3 (1st Cir.1990) (feigned gun, actually a pocket knife, held in robber's pocket, a dangerous weapon under § 2113(d)); *cf. United States v. Dixon,* 982 F.2d 116, 122–23 (3d Cir.1992) (hand underneath a towel, represented to be a gun, a dangerous weapon under Guidelines), *cert. denied,* —— U.S. ——, 113 S.Ct. 2371, 124 L.Ed.2d 276 (1993); *United States v. Taylor,* 960 F.2d 115, 116 (9th Cir.1992) (bulge in waistband, represented to be a gun, a dangerous weapon under Guidelines); *but cf. United States v. Hawkins,* 901 F.2d 863, 865 (10th Cir.1990) (upward departure for false claim of being armed inappropriate); *United States v. Coe,* 891 F.2d 405, 411 (2d Cir.1989) (same).

An assault with a dysfunctional bomb poses the same or similar dangers and gives rise to the same kind of harms as an assault with an unloaded gun. Even a dysfunctional bomb engenders in the assault victims the fear of bodily injury beyond that instilled by a simple assault, *see United States v. Martinez–Jimenez,* 864 F.2d 664, 666 (9th Cir.), *cert. denied,* 489 U.S. 1099, 109 S.Ct. 1576, 103 L.Ed.2d 942 (1989); *United States v. Mahler,* 891 F.2d 75, 77 (4th Cir.1989) (quoting *Martinez–Jimenez* and applying it to sentencing guidelines); *see also United States v. Beasley,* 438 F.2d 1279, 1282–83 (6th Cir.), *cert. denied,* 404 U.S. 866, 92 S.Ct. 124, 30 L.Ed.2d 110 (1971), fear that can, for instance, bring on heart attacks and other adverse medical consequences. *See United States v. Medved,* 905 F.2d 935, 940 (6th Cir.1990), *cert. denied,* 498 U.S. 1101, 111 S.Ct. 997, 112 L.Ed.2d 1080 (1991). Law enforcement authorities must respond to the perceived threat of explosion, driving them to more deliberate and less efficient means of responding to the assault. *Martinez–Jimenez,* 864 F.2d at 666. And even though it is actually incapable of inflicting the injuries it threatens, an inoperable bomb creates a danger that a violent response will ensue. *See McLaughlin,* 476 U.S. at 17, 106 S.Ct. at 1678. Ordinarily, this danger will arise because those threatened, their rescuers, or the police, can be expected to respond with force and possibly deadly force, and thereby endanger the safety of victims, bystanders, and even the perpetrator. *See, e.g., Martinez–Jimenez,* 864 F.2d at 666; *Beasley,* 438 F.2d at 1283. But even where, as here, the weapon has been mailed and there is little risk of retaliation against the sender which would endanger those involved, there is still an immediate danger of injury to those who flee or otherwise furiously react to the perceived threat to their lives, and to innocent bystanders. In short, the sender of an inoperable mail-bomb, although distant from his victims, sets in motion events that pose danger to human life and harm society no less so than the criminal courier who delivers the bomb to his victim by hand.

---

**9.** *See also United States v. Garrett,* 3 F.3d 390, 391 (11th Cir.1993) (toy gun a dangerous weapon under § 2113(d)), *cert. denied,* —— U.S. ——, 114 S.Ct. 1100, 127 L.Ed.2d 413 (1994); *United States v. Cannon,* 903 F.2d 849, 854–55 (1st Cir.) (same), *cert. denied,* 498 U.S. 1014, 111 S.Ct. 584, 112 L.Ed.2d 589 (1990); *United States v. Medved,* 905 F.2d 935, 939–40 (6th Cir.1990) (same), *cert. denied,* 498 U.S. 1101, 111 S.Ct. 997, 112 L.Ed.2d 1080 (1991); *United States v. Martinez–Jimenez,* 864 F.2d 664, 668 (9th Cir.) (same), *cert. denied,* 489 U.S. 1099, 109 S.Ct. 1576, 103 L.Ed.2d 942 (1989). The only circumstance in which section 2113(d) has been held inapplicable to the use of a toy gun was where the gun was concealed during a bank robbery and never displayed, *i.e.,* where it was never "used." *See United States v. Perry,* 991 F.2d 304, 309–10 (6th Cir.1993).

We thus conclude as a matter of law that Hamrick's bomb could be considered by the jury to constitute a "dangerous weapon" under 18 U.S.C. § 111(b). Accordingly, we affirm his Count VII conviction for assault of a federal officer with a dangerous or deadly weapon.

## III.

The jury also convicted Hamrick for the unlawful making of a destructive device, 26 U.S.C. § 5861(f) (Count I); the unregistered possession of a destructive device, *id.* § 5861(d) (Count II); the unlawful transfer of a destructive device, *id.* § 5861(e) (Count III); the use of a destructive device during and in relation to the attempted murder of a federal officer, *id.* § 924(c)(1) (Count VI); and the use of a destructive device during and in relation to the assault of a federal officer, *id.* § 924(c)(1) (Count VIII).[10] The panel reversed these five convictions, holding that the jury instructions were "plain error." *See Hamrick I,* 995 F.2d at 1271–72. Relying ultimately on *United States v. Malone,* 546 F.2d 1182, 1184 (5th Cir.1977) ("the complete absence of explosive material would prevent the component parts from being a destructive device"), the panel held that Hamrick's bomb was not a destructive device because not all of the necessary component parts of a bomb were actually in Hamrick's possession and working. These convictions are now affirmed by an equally divided court.

## IV.

Hamrick also was convicted of sending through the mails a nonmailable article, a mechanical and chemical device which might have ignited, with the intent to injure or kill another. *See* 18 U.S.C. § 1716. Hamrick challenges the sufficiency of the evidence supporting this conviction, arguing that since his bomb was dysfunctional, it was not a nonmailable article.

A finding that Hamrick's bomb was capable of operating as designed is, contrary to Hamrick's assertions, unnecessary to support a conviction under section 1716. Nonmailable matter is statutorily defined as:

> explosives, inflammable materials, infernal machines, and mechanical, chemical, or other devices or compositions which may ignite or explode, ... and all other natural or artificial articles, compositions, or material which may kill or injure another, or injure the mails or other property....

*Id.* § 1716(a). Although Hamrick's bomb, as constructed, may have been incapable of functioning as a bomb, it was comprised of cigarette lighters containing inflammable liquified butane. As noted, expert witnesses testified that if one of the lighters were ruptured, the butane within could easily have ignited, creating a fireball. Indeed, the plastic casing of one of the lighters had been scraped thin, further increasing the risk it might rupture and ignite during handling by the Postal Service. *Cf. United States v. Merrill,* 746 F.2d 458, 461 (9th Cir.1984) (.22 caliber bullets, which could have been detonated by mechanical canceling machines, were nonmailable), *cert. denied,* 469 U.S. 1165, 105 S.Ct. 926, 83 L.Ed.2d 938 (1985). Viewing this evidence in the light most favorable to the government, *see, e.g., Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Tresvant,* 677 F.2d 1018, 1021 (4th Cir.1982), we conclude that a reasonable jury could easily have found that Hamrick mailed a device which might have ignited, and was therefore guilty of violating section 1716.

## V.

Hamrick also argues that the evidence was insufficient to support a finding that he possessed the intent required for conviction either for assault, *see* 18 U.S.C. § 111(b), or for attempted murder, *see id.* § 1114, of United States Attorney Kolibash.

---

**10.** The Internal Revenue Code defines the term "destructive device" to include "any explosive, incendiary, or poison gas ... bomb" and numerous similar devices. 26 U.S.C. § 5845(f)(1). The definition also includes "any combination of parts either designed or intended for use in converting any device into a destructive device [such as an explosive, incendiary, or poison gas bomb] and from which a destructive device may be readily assembled." *Id.* at § 5845(f)(3). An identical definition of "destructive device" appears at 18 U.S.C. § 921(a)(4) and is applicable to section 924(c)(1).

He argues that he had intended only to register his displeasure at being prosecuted by sending Kolibash a joke bomb, one which he never intended to detonate.

We disagree. From the evidence adduced at trial, a reasonable jury could easily have found that Hamrick mailed the bomb he had built with the intent that it would explode and kill United States Attorney Kolibash. The government's experts testified that the bomb had been designed to explode when the envelope in which it was mailed was opened and that it was too complete to have been meant as a hoax. Moreover, in his statements to the FBI and his signed confession, Hamrick himself admitted that he had intended the bomb to explode and had mailed it to Kolibash in retaliation for being brought to Wheeling to stand trial. In his letter to the West Virginia American Civil Liberties Union, Hamrick again implicated himself in the attempted bombing. Finally, the very circumstance of Hamrick sending a bomb to the United States Attorney responsible for his prosecution supports an inference of intent. This evidence is more than sufficient to support the conclusion that Hamrick intended the bomb to explode and kill a United States Attorney. The jury did not regard the bomb as a joke (nor do we) and was not required to so consider it.

### VI.

■ Hamrick also claims that the district court erred by refusing to instruct the jury on the theory of legal impossibility as a defense to the charge of attempted murder. The defense of legal impossibility is available where the defendant's acts, even if fully carried out as intended, would not constitute a crime. Hamrick contends that, because his bomb was incapable of exploding, he could not have committed or attempted murder.

Had Hamrick's acts been carried out as he intended, i.e., if the bomb had exploded when Kolibash opened the envelope, the substantive crime of attempted murder (if not murder itself) would have been committed. The defense of legal impossibility therefore was simply not available to Hamrick.

■ Though not denominated as such, Hamrick appears to have been actually seeking an instruction on factual impossibility. Factual impossibility exists "where the objective is proscribed by the criminal law but a factual circumstance unknown to the actor prevents him from bringing it about." *United States v. Conway*, 507 F.2d 1047, 1050 (5th Cir.1975). However, factual impossibility is traditionally not a defense to a charge of attempt, and we now join those circuits that have expressly held that it is not a defense to an attempt crime. *United States v. Medina–Garcia*, 918 F.2d 4, 8 (1st Cir.1990); *United States v. Contreras*, 950 F.2d 232, 237 (5th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2276, 119 L.Ed.2d 202 (1992); *United States v. Peete*, 919 F.2d 1168, 1175–76 (6th Cir.1990); *United States v. Luttrell*, 889 F.2d 806, 810 (9th Cir.1989), *vacated in part on other grounds*, 923 F.2d 764 (9th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1558, 118 L.Ed.2d 207 (1992).

The district court did not err by refusing to charge the jury on either legal or factual impossibility. *See United States v. Camejo*, 929 F.2d 610, 614 (11th Cir.1991), *cert. denied*, 502 U.S. 880, 112 S.Ct. 228, 116 L.Ed.2d 185 (1991).

### VII.

Hamrick also challenges three evidentiary rulings made by the district court. He contends that the court erred by allowing the government to cross-examine his expert about admitted errors in the expert's testimony in previous cases, that his letter to the West Virginia American Civil Liberties Union—in which he admitted involvement in sending a "letter bomb" to Kolibash—was irrelevant and therefore improperly admitted, and, without explanation, that his confession was involuntary. We find these contentions to be wholly without merit. Both the allowance of cross-examination and the admission of Hamrick's letter to the ACLU chapter were well within the sound discretion of the trial court. And there is no basis whatsoever for questioning the voluntariness of Hamrick's confession.

## VIII.

■ The district court sentenced Hamrick to thirty years imprisonment for the use of a destructive device during and in relation to a crime of violence, this sentence to run consecutively to all other sentences. This sentence was imposed pursuant to 18 U.S.C.A. § 924(c)(1), which provides in pertinent part:

Whoever, during and in relation to any crime of violence ... uses or carries a firearm, *shall,* in addition to the punishment provided for such crime ..., be sentenced to imprisonment for five years, ... and if the firearm is ... a destructive device ... to imprisonment for thirty years.

*Id.* (emphasis added). Hamrick contends that the terms "firearm" and "destructive device" are interchangeable and that the district court thus should have imposed the shorter sentence prescribed for the use of a "firearm."

■ While "firearm" is defined to include, *inter alia,* "destructive device," *see* 18 U.S.C. § 921(a)(3), the terms are not strictly interchangeable; rather, a "destructive device" is a subset of "firearm," the use of which Congress has chosen to punish more severely.[11] The statute is unambiguous that the use of a destructive device during and in relation to a crime of violence *shall* be punished by thirty years imprisonment. The terms of imprisonment specified by section 924(c)(1), therefore, are mandatory, and the district court is without discretion to deviate from the plain command of the statute. *See, e.g., United States v. Dumas,* 934 F.2d 1387, 1389–90 (6th Cir.), *cert. denied,* 502 U.S. 1006, 112 S.Ct. 641, 116 L.Ed.2d 658 (1991); *United States v. Hatch,* 925 F.2d 362, 363 (10th Cir.1991); *United States v. Grinnell,* 915 F.2d 667, 668–69 (11th Cir.1990).

It has been suggested that a thirty year additional sentence for the use of an improvised dysfunctional incendiary bomb in the attempted assassination of a United States Attorney is too harsh. We do not share this view. However, even if we were of this view,

we would have no choice but to enforce this sentence. We have no authority under the law to do otherwise.

The judgment of the district court is, in all respects, affirmed.

*AFFIRMED.*

LUTTIG, Circuit Judge, concurring:

The public is entitled to know all of the relevant facts underlying this or any other prosecution and, as an inferior court, we have a solemn obligation to the Supreme Court of the United States to include all such facts in the opinions of this court. From time to time, of course, there will be a disagreement within the court over the relevance of certain facts and testimony to the issues addressed by the court, quite apart from any disagreement over the legal reasoning underlying the court's ultimate decision to affirm or reverse the defendant's convictions. When there is such a disagreement over the relevance of particular facts, we have an affirmative obligation to explain the basis for our respective conclusions as to their relevance, in order that the public and the Supreme Court be fully informed. The extent to which we insist upon a complete recitation of all potentially relevant facts has profound implications for further review by our Nation's highest tribunal, for the lives of those whom our decisions touch, and for the public's perception of the integrity of the court as an institution of government.

## I.

In this case, Chief Judge Ervin and Judge Hamilton maintain that the government witness' testimony that Hamrick's bomb was capable of detonating as constructed without any additional parts, is irrelevant to whether Hamrick's bomb was a dangerous weapon, and that the court should include no reference to this testimony. *See post* at 890 n. 2 (Hamilton, J., concurring); *post* at 891–893 n. 1 (Ervin, Chief Judge, dissenting). Both of my colleagues refuse even to join Part III of

---

**11.** Congress specifically added destructive devices to the class of firearms whose use is punished by the thirty year sentence in the Crime Control Act of 1990, Pub L. No. 101–647, § 1101, 1990 U.S.C.C.A.N. (104 Stat.) 4789, 4829. This Act became effective upon enactment on November 29, 1990.

the court's opinion, which states in four innocuous sentences that Hamrick's "destructive device" convictions are affirmed by an equally divided court, because two of these four sentences, in reciting the panel's holding and reasoning on the "destructive device" convictions, allude to the testimony to which they object.

This testimony was not cited or discussed in the original panel's unanimous opinion reversing Hamrick's convictions, *see* 995 F.2d 1267 (4th Cir.1993); indeed, the testimony was incorrectly characterized in the single passage in the panel opinion that obliquely references it, *see* discussion *infra.* It is likewise not mentioned by Chief Judge Ervin in his dissent in this case. Thus, were we not to address this testimony, it would never be publicly known.

This testimony is not only highly relevant to the issues addressed by the court, but is the single most relevant evidence in the case. It is not only directly relevant to Hamrick's Count VII conviction for assault of a federal officer with a dangerous weapon; it also confirms that Hamrick's convictions on Counts I, II, III, VI, and VIII are unassailable under any plausible interpretation of the term "destructive device," including that adopted by the original panel. I do not believe that any member of the court is foreclosed from discussing this testimony merely because other members of the court may disagree that it is relevant. I further believe, for the reasons set forth below, that we would disserve the public and the Supreme Court were we not to address this particular testimony.

### A.

The testimony, which is briefly discussed in the court's opinion, *see ante* at 881–882, is primarily that of Mr. Warren Parker, one of the government's chief witnesses. The whole of the panel's reference to Parker's testimony appears in the following two sentences:

The final expert witness's testimony was not certain on whether the bomb as constructed could have detonated. He testified, however, that with the substitution of readily available materials, the bomb could have exploded.

995 F.2d at 1270. In fact, Parker testified unequivocally that the bomb as constructed could have detonated, and that it may well have failed to detonate only because its parts had been disturbed during mailing.

Specifically, Parker testified that the wires, which ran from the batteries to the butane lighters, themselves could have become so hot as to detonate the bomb, without the addition of a single other part:

[M]erely ... weakening the walls [of the lighters] enough to allow that [butane] to vent would act as a mechanism for the function of this bomb. *In this case, it is— it is possible that that wire could heat enough to do that, a spark or flame be generated by the heated wire sufficient to ignite the thing, producing the fire ball* ... at least several feet in diameter ... [and] well over a thousand degrees.

J.A. at 207–08 (emphasis added). Even Hamrick's counsel understood Parker to have so testified. *See id.* at 215 (statement by John Pizzuti) ("You testified ... that it was possible that the wire in this alleged bomb could heat enough to cause ignition to produce a fire ball.").

In addition to his testimony that the bomb could have been detonated by the heat from the wires alone, Parker also testified that had the yellow sheets of legal paper in the letter bomb become inflamed, as intended, rather than simply been scorched, they, too, could have detonated the bomb:

Q: [Mr. Parker,] [h]ave you formed an opinion concerning the effect on the functioning of the device if the yellow legal pad papers had ignited?

A: Well, if any open flame would have been a source of ignition for the butane contained in the lighters.

Q: Would that include the yellow legal pad?

A: Including the yellow legal pad.

*Id.* at 212.

Parker went on to explain that, in his view, it may well have been that the bomb failed to detonate only because its parts were jostled in the mail. United States Attorney Horne

asked Parker whether he had "formed an opinion as to the effect of mailing of the device on whether or not it would function." *Id.* at 210. After observing that in his experience a "large portion" of letter bombs fail to detonate because parts become dislocated in the mails, Parker testified:

I believe that shipping [this particular device] through the mail and the handling it received could well have affected its functional ability and caused it to be dysfunctional.

*Id.*

Parker thereafter testified as to the "commonly available" materials that could have been substituted for the pink substance as fuses. The panel, characterizing this testimony, said that although Parker "was not certain on whether the bomb as constructed could have detonated," he testified that it could have exploded "with the substitution of readily available materials." 995 F.2d at 1270. However, Parker actually testified not that "the bomb could have exploded" only with the substitution of these materials, but rather that the substitution of these materials would have *enhanced* the likelihood that the bomb would detonate:

Q: [Mr. Parker,] [h]ave you formed an opinion as to whether modifications using commonly-available materials could have been made *to increase the likelihood that the device would function?*

A: I would be reluctant to be a bomb instructor, but certainly many common materials that I would have available or that are available *could have improved the possibility of that* to dysfunction [sic] considerably.

Q: Have you formed an opinion whether commonly available materials might have been substituted for the pink substance *to enhance the chances for it to function?*

A: Well, the laboratory analysis established that the pink substance was not flammable. Had a flammable material been there, *that would have greatly enhanced its probability of functioning.*

Q: Have you formed an opinion whether or not hamburger grease could have served *that function?*

A: Hamburger grease would be one thing that would burn.

Q: Have you formed an opinion whether or not WD–40 could have served *that function?*

A: Certainly it has a flammability characteristic.

Q: Have you formed an opinion whether or not match heads could have served *that function?*

A: Very easily match heads could cause that to happen.

Q: Have you formed an opinion whether or not toilet paper could have served *that function?*

A: Yes, any readily available ignitable material substituted for the apparently nonflammable material *would have enhanced its ability to have worked.*

*Id.* at 210–12 (emphases added).

In sum, Parker's testimony, which was not cited, quoted or discussed by the panel, and which is not cited, quoted or discussed by the dissent or Judge Hamilton, exposes the error of the panel when it stated that Parker "was not certain on whether the bomb as constructed could have detonated," and when it said that Parker testified that the device could only have exploded with the substitution of other materials. And it confirms the panel's error when it concluded that,

[i]n the instant case, unlike *[United States v.] Morningstar* [456 F.2d 278 (4th Cir. 1972)], Hamrick was not in possession of all of the parts needed to construct a destructive device within the meaning of the statute. Hamrick did not have all of the necessary parts in order for the dysfunctional bomb to qualify as a destructive device. As in *Malone*, a key component of the device was missing. The unidentified pink substance, serving as the ignitor, was dysfunctional. Moreover, an expert witness testified that the nine-volt battery could not have produced sufficient heat to ignite any number of readily available substitute fuses.... [T]he device is incapable of detonation. The bomb was incapable of detonating; therefore it cannot be a de-

structive device under section 5845(f) or its counterparts.

995 F.2d at 1271.

More importantly, Parker's testimony exposes the error that would be worked were the court today to reverse *either* Hamrick's Count VII conviction, as urged by the dissent, or his convictions under Counts I, II, III, VI, and VIII, as urged by the dissent and Judge Hamilton.

## B.

Chief Judge Ervin and Judge Hamilton argue that no reference to Parker's testimony should be made, even by the majority of the court that affirms Hamrick's conviction for use of a "deadly or dangerous weapon," on the ground that whether Hamrick's device would explode is irrelevant to the question of the bomb's dangerousness. *See, e.g., post* at 890–93 n. 1 (Ervin, Chief Judge, dissenting); *post* at 890 n. 2 (Hamilton, J., concurring) (referring to court's "unnecessary and unfortunate reliance on" government expert's testimony). Such an argument requires no response. It is self-evident that the fact that a bomb could explode is relevant to its dangerousness. One need look no further than to the fact that Parker's testimony—that the device was fully capable of detonation—completely undermines Chief Judge Ervin's own rationale for concluding that the bomb was not a dangerous weapon, namely, that the device "lacked at least one necessary element to make it work," and therefore was incapable of inflicting injury or death, *see post* at 894.

Parker's testimony speaks directly, as well, to the *McLaughlin* criteria, under which the dangerousness *vel non* of Hamrick's device is assessed. It establishes that the first of these criteria—that the article be typically and characteristically dangerous and be manufactured for a dangerous use—is indisputably proven. For no one could maintain that a bomb capable of detonation is not typically dangerous and manufactured for a dangerous use. As Judge Hamilton observes, these are matters of "[p]ure common sense." *See post* at 890 n. 2 (Hamilton, J., concurring).

Moreover, by proving beyond any question that the device was in fact capable of injuring or killing persons and destroying property, this testimony also eliminates the issue of putative dangerousness that gives rise to Judge Hamilton's conclusion that he is "constrained" by Supreme Court precedent to affirm Hamrick's Count VII conviction, *see post* at 890–91.

Apart from its obvious relevance to the dangerousness of Hamrick's bomb, Parker's testimony also provides more than enough basis for a reasonable juror to conclude, under any reasonable interpretation of the term "destructive device"—including the panel's notion that all parts necessary for the device to detonate must be in the possession of the defendant—that Hamrick's Counts I, II, III, VI, and VIII convictions should have been affirmed by the panel and must be affirmed here.

Given the testimony elicited by the government from Parker, among others, it is plain that all of Hamrick's convictions must be affirmed under any reasonable interpretation of the terms "dangerous weapon" and "destructive device." In this particular case, this is little more than simple recognition by the law that Hamrick is a proven criminal with a demonstrated willingness to construct and mail bombs to any public official of whose actions he disapproves. That he is such is evident from his convictions and activities prior to those underlying this appeal, which the panel also nowhere mentioned and the dissent likewise contends are irrelevant. It is evident even from his activities since the time of his appeal, including the fact that it appears that only nine days after this case was argued before the court *en banc*, Hamrick sent yet another bomb from Marion Federal Penitentiary to Special Assistant United States Attorney David J. Horne, who had represented the United States at Hamrick's trial in the district court and before the original and *en banc* panels of this court.

## II.

Chief Judge Ervin does not share my understanding of our responsibility to the public and to the Supreme Court in a case such as this. In his view, unless there is a majority of judges who join a single opinion for the

court, we have no duty to the public, the parties or even to the Supreme Court, to address all of the facts that may bear on the resolution of the defendant's legal claims. Thus, he believes that where, as here, a majority of the court agrees to dispose of the defendant's claim in the same way, but only a plurality opinion emerges, there should be no discussion of those facts whose relevance the plurality and the dissent disagree over. Such discussion, in his judgment, amounts to nothing more than "provid[ing] fodder to the [Supreme] Court." With respect, I simply cannot subscribe to this view. In my opinion, we have no higher obligation in any context than to set forth fully and faithfully the facts to which the law is to be applied. The parties are no less bound by a plurality opinion. With a plurality opinion, no less than with a majority opinion, the Supreme Court must decide *on the facts presented* whether the defendant has been constitutionally denied his life or liberty.

Chief Judge Ervin, because he fails to acknowledge the difference between the reasoning of a decision and the underlying facts of a case, suggests that the Supreme Court agrees with his view of our responsibility. It does not. Even putting to one side the obvious difference between a Court of Appeals and the Supreme Court in terms of the unreviewability of decisions, the Supreme Court always discusses both the relevant facts and the holding by the court from which the appeal is taken, where, as here, it disposes of a case by a plurality vote. It even discusses the facts and holding below when it affirms one of several issues by an equally divided court, as we do in this case. *See, e.g., United States v. Zolin,* 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989); *Carpenter v. United*

*States,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). Indeed, it is odd that Chief Judge Ervin cites *Carpenter* as an example of a case in which the Court provided none of the underlying facts or the holding below; the Court recited both. *Carpenter,* 484 U.S. at 22–24, 108 S.Ct. at 318–20. The only context in which the Supreme Court does not recite the underlying facts and holdings is when an equally divided court decides the only issue before the Court. Of course, this is not the circumstance we face today.

HAMILTON, Circuit Judge, concurring in the judgment:

As to Hamrick's convictions on Counts I, II, III, VI, and VIII, the en banc court affirms these convictions by an equally divided court. In my view, the destructive device convictions having been affirmed by an equally divided court, the sentence enhancement is likewise sustained by an equally divided court.[1] I also agree with the apparent consensus of the entire *en banc* court that Hamrick's attacks as to his convictions on Counts IV and V have no merit. In addition, I would affirm Hamrick's conviction on Count VII on the sole basis that under the Supreme Court's decision in *McLaughlin v. United States,* 476 U.S. 16, 106 S.Ct. 1677, 90 L.Ed.2d 15 (1986), the bomb in question constitutes a deadly or dangerous weapon under 18 U.S.C. § 111(b) because a bomb (though dysfunctional) is "typically and characteristically dangerous" and "instills fear in the average citizen." *Id.* at 17–18, 106 S.Ct. at 1678.[2] Finally, I add this cautionary note. To the extent that Judge Luttig's plurality and concurring opinions may be construed to mean that the bomb in question was a destructive device under 18 U.S.C. §§ 921(a)(4)

1. No member of this court apparently takes issue with the fact that *if* the bomb in question *was* a destructive device, the enhancement should apply.

2. I cannot join the plurality opinion of Judge Luttig addressing this point because of its unnecessary and unfortunate reliance on cases involving destructive devices and the testimony of the government's experts regarding whether the bomb in question was capable of detonation. Citation to the destructive device cases is inappropriate for several reasons. First, as this case pellucidly illustrates, our destructive device jurisprudence (namely, what constitutes a destructive device) is unsettled. Second, these cases offer no

guidance whatsoever as to what constitutes a deadly or dangerous weapon under 18 U.S.C. § 111(b). Third, citation to these cases may be construed as an endorsement that the bomb in question was a destructive device, a matter that the court is *evenly divided on.* Citation to the testimony of the government's experts regarding the bomb in question's capability of detonation is also, in my view, inappropriate. As the plurality opinion recognizes when it states "the presumption that the bomb sent by Hamrick was dangerous was fully warranted, even though the bomb appears to have been dysfunctional," plurality op. at 881, the issue under the first two of *McLaughlin's* three independent rationales is

and 924(c)(1) and 26 U.S.C. §§ 5845(f) and 5861, *see* plurality op. at 881–82 (citing destructive device cases and testimony of government experts), plurality op. at 13 (discussing procedural history of destructive device convictions), and plurality op. at 885–86 (discussing the § 924(c) sentencing enhancement for use of a destructive device), and concurring op. at 886–89 (discussing the testimony of the government experts and the sufficiency of the evidence of the destructive device convictions), such a construction is pure dicta of no precedential value.[3]

ERVIN, Chief Judge, dissenting:

This case presents a straightforward question of statutory construction to determine whether the item Hamrick sent to the United States Attorney falls within the definition of a "deadly or dangerous weapon" pursuant to

not whether the bomb in question was capable or incapable of detonation. Rather, under the first independent rationale, the questions are whether a bomb in general is typically and characteristically dangerous and the use for which a bomb is manufactured is a dangerous one. Pure common sense tells us that the answer to these inquiries is yes, and, therefore, *McLaughlin*'s first independent rationale is met. As to *McLaughlin*'s second independent rationale, no showing of capability of detonation is necessary here because even a dysfunctional bomb, upon display, instills fear in the average citizen. Therefore, this testimony is irrelevant to the dangerous weapon inquiry.

3. Of course, any view (including my own) that the bomb in question was or was not a destructive device bears *no* precedential weight because the court affirms the destructive device convictions by an equally divided court. *See Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 234 n. 7, 107 S.Ct. 1722, 1730 n. 7, 95 L.Ed.2d 209 (1987).

1. As to the question of whether this device constituted a "deadly or dangerous weapon" under 18 U.S.C. § 111(b), eight of the fourteen judges of the en banc court vote to affirm the conviction, while six vote to reverse. Seven of the eight affirming judges join Judge Luttig's plurality opinion in its reasoning on this point, contained in section II. Judge Hamilton concurs in the judgment alone. As to the question of whether this device constituted a "destructive device" under the provisions of 18 U.S.C. § 924(c)(1) (the definition for which appears at 18 U.S.C. § 921(a)(4)) and 26 U.S.C. § 5861 (the definition for which appears at 26 U.S.C. § 5845(f)), seven judges vote to affirm and seven vote to reverse,

18 U.S.C. § 111(b). Beyond the plain meaning of the words Congress employed, neither the statute nor its legislative history offers guidance on this question, a fact the plurality opinion implicitly acknowledges through its act of "borrowing" the jurisprudence of a separate provision of the United States Code. In my view, the plain meaning suffices to convince me that an incomplete bomb lacking an igniter is not a "deadly or dangerous weapon" for purposes of sentence enhancement. Because I do not believe that the borrowed provision is apposite to the statute in question, or that the application of its teaching in this instance leads to the result the plurality believes dictated, I respectfully dissent.[1]

I

As the plurality opinion notes, the statute in question provides a penalty enhancement

leading to an affirmance by an evenly divided court. The court thus divides evenly and affirms as to Counts I, II, III, VI, and VIII, as discussed in section III of Judge Luttig's opinion. Although all of the judges of the court agree that the thirty year sentence enhancement under 18 U.S.C. § 924(c)(1) is mandated if Hamrick's device can properly be labeled a "destructive device," because the court affirms by an equally divided vote over that underlying question, the affirmance of the sentence enhancement, as discussed in section VIII of Judge Luttig's opinion, also is by an equally divided vote. Of course, "an affirmance by an equally divided Court is not entitled to precedential weight." *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 234 n. 7, 107 S.Ct. 1722, 1730 n. 7, 95 L.Ed.2d 209 (1987) (*citing Neil v. Biggers,* 409 U.S. 188, 192, 93 S.Ct. 375, 378, 34 L.Ed.2d 401 (1972)). Sections III and VIII of Judge Luttig's plurality opinion thus should be understood to be of no precedential value.

In the fifth paragraph of section II, the plurality cites three cases to bolster its contention that the bomb was a "deadly or dangerous weapon" under 18 U.S.C. § 111(b). A review of those cases discloses that each concerns itself with nothing more than the construction of the definition of "destructive device" contained in 26 U.S.C. § 5845(f). *The construction of that statute is precisely the issue on which the court has evenly divided* as to counts I, II, III, VI, and VIII. None of these three cases addresses in any fashion the scope of the "deadly or dangerous weapon" statute.

I do not understand the logic of the plurality opinion's reliance on three cases construing whether certain items constituted "destructive devices" under one provision of the law to sup-

port its opinion that Hamrick's device was a "deadly or dangerous weapon" under another provision. The language of the opinion offers no explication of that thinking beyond a mere conclusory line, which contains a significant non sequitur, relying as it does on three cases discussing what constitutes a "destructive device" to support its easy conclusion ("[o]f course") that "the bomb sent by Hamrick was dangerous."

In addition to this citation to three cases, the paragraph continues with a recital of evidence from trial that was introduced to support the prosecution's contention that this device met the definition of a "destructive device." Again, I fail to see the connection.

It would be troubling if the plurality opinion merely attempted to use a definition or holding under one statute to explicate that of another. See part II, *infra.* Such an approach would simply disclose incorrect thinking that a court need not concern itself with technical, definitional niceties when dealing with Congressional enactments in the area of criminal law, so that one definition can take the place of another when necessary. What occurs here, however, is another matter entirely. The cases the plurality opinion cites were prominently relied upon by the prosecution in its brief to this court on rehearing en banc to support the position that the convictions as to the "destructive device" charges should be affirmed. The court affirms those convictions by an evenly divided vote; by implication, seven of the fourteen judges of the en banc court reject the approaches these cases take in application to the present facts. Yet, offering no explanation of how they advance our understanding of the "deadly or dangerous weapon" statute, the plurality opinion includes them in its discussion of that statute as a mere gratuity, and an unfortunate one indeed. The reader should be clear: as Judge Hamilton states, the scope of the destructive device statutes remains an uncertain question in this circuit, and the plurality opinion's citation to these cases cannot be taken as guidance for the future.

Finally, it is neither necessary nor appropriate for me to account for the charges of misfeasance, malfeasance and nonfeasance that Judge Luttig raises against this opinion and my prior panel opinion in his remarkable and unique separate concurring opinion. I do find it necessary, however, to explain briefly why I take issue with Judge Luttig's position that we have a solemn obligation to the public and to the Supreme Court to account for our views in every case, even cases in which the court is completely at loggerheads and the court divides evenly. The first purpose of a court is to decide the case before it. As an appellate court, we have a secondary duty to provide guidance to the lower courts of this circuit as to the law for their application in future cases. When there is a unanimous decision by this court, or even a majority opinion, the court properly explains the reasons that have guided it to the given result so that future courts may apply the rule either directly or through analogical reasoning to the matters before them. Thus both of our responsibilities are satisfied as the case is resolved and we have provided guidance to the lower courts. On the other hand, in a case such as the present one, where we affirm by an equally divided court, although we resolve the particular dispute before us by use of a background rule of affirmance, we cannot provide any guidance to the lower courts for them to apply to future cases as to the legal question in controversy, for a majority of the judges cannot agree as to what the law dictates. Since we can provide no guidance, I think it is entirely appropriate that we not address the question on the merits, but instead leave it for another day.

When cases before the Supreme Court have resulted in an equally divided vote, it has been the practice of the Supreme Court in every instance that my research has disclosed to go no further than to state that the Court was equally divided and that it therefore affirms, whether in full or only partial resolution of the case at hand. *E.g., Morgan Stanley & Co. v. Pacific Mut. Life Ins. Co.,* ⸺ U.S. ⸺, 114 S.Ct. 1827, 128 L.Ed.2d 654 (1994) (full resolution); *Ford Motor Credit Co. v. Department of Revenue,* 500 U.S. 172, 111 S.Ct. 2049, 114 L.Ed.2d 232 (1991) (same); *United States v. France,* 498 U.S. 335, 111 S.Ct. 805, 112 L.Ed.2d 836 (1991) (same); *United States v. Zolin,* 491 U.S. 554, 561, 109 S.Ct. 2619, 2625, 105 L.Ed.2d 469 (1989) (partial resolution); *Carpenter v. United States,* 484 U.S. 19, 24, 108 S.Ct. 316, 319–20, 98 L.Ed.2d 275 (1987) (same). This practice comports with the view expressed above that when a court is unable to obtain a majority of judges voting for the same result, the better course is not to speak at all, for it cannot fulfill its responsibility to provide guidance to lower courts. If I am in error in this view, I am in good company. *See, e.g., In re Grand Jury Subpoena of Williams,* 963 F.2d 567 (3d Cir.1992) (en banc); *Lawrence v. Creditthrift of America,* 644 F.2d 506 (5th Cir.1981) (en banc); *Sundberg v. Mansour,* 847 F.2d 1210 (6th Cir.1988) (en banc); *Schultz v. Frisby,* 822 F.2d 642 (7th Cir.1987) (en banc), *rev'd,* 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988); *United States v. Furlow,* 980 F.2d 476, 478 (8th Cir. 1992) (en banc), *cert. denied,* ⸺ U.S. ⸺, 113 S.Ct. 2353, 124 L.Ed.2d 261 (1993); *United States v. Rivera,* 874 F.2d 754 (10th Cir.1989) (en banc); *Lee v. Macon County Bd. of Educ.,* 995 F.2d 184 (11th Cir.1993) (en banc); *Ginsburg, Feldman & Bress v. Federal Energy Admin.,* 591 F.2d 752 (D.C.Cir.1978) (en banc), *cert. denied,* 441 U.S. 906, 99 S.Ct. 1994, 60 L.Ed.2d 374 (1979); *Lariscey v. United States,* 981 F.2d 1244 (Fed. Cir.1992) (en banc), *cert. denied,* ⸺ U.S. ⸺, 113 S.Ct. 2997, 125 L.Ed.2d 691 (1993).

The approach taken by Judge Luttig, in contrast, requires each judge of a court to provide a reason for his or her actions, no matter that such views are of no precedential value whatsoever, because we have a solemn duty to do so to assist the Supreme Court in evaluating the case. Besides noting my firm conviction that the Court is quite able from the trial record and the briefs of

for any person who assaults one of a class of current or former federal officers while they are engaged in or on account of the performance of their official duties. Although the maximum statutory penalty for such offense is three years, 18 U.S.C. § 111(a), anyone who uses a "deadly or dangerous weapon" in the commission of such acts is subject to a maximum penalty of ten years, *id.* § 111(b). Thus, before a defendant can be eligible for the punishment provided under § 111(b), it is necessary to determine whether the assault involved the use of a "deadly or dangerous weapon."

The role of the courts in cases of statutory construction is to give effect to Congressional intent, *Negonsott v. Samuels,* —— U.S. ——, —— ——, 113 S.Ct. 1119, 1122–23, 122 L.Ed.2d 457, 465 (1993); to do more is to transgress the boundaries of the Articles of the Constitution and to engage ourselves as legislators rather than jurists, to allow ourselves to say what we think the law is, or ought to be, rather than what Congress has told us it is. While this temptation hangs always before the judiciary as a tantalizing fruit, it is to us constitutionally forbidden. Because our concern is to carry out that which Congress has wrought, in determining whether any action or situation falls within the borders of the class of activities Congress intended to reach through statutory prohibition we begin with the words of the statute itself, for if they are clear and unambiguous, the task of the courts is ended. *Estate of Cowart v. Nicklos Drilling Co.,* —— U.S. ——, ——, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379, 388 (1992); *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981); *United States v. Southern Mgt. Corp.,* 955 F.2d 914, 920 (4th Cir. 1992). Where the intent of Congress is not clear, we must reach for traditional tools of statutory construction to assist us in elucidating, but never extending or supplanting, Congressional intention as to the scope of the statute in question. *Public Citizen v. United States Dep't of Justice,* 491 U.S. 440, 453–55, 109 S.Ct. 2558, 2566–67, 105 L.Ed.2d 377 (1989); *Gray v. Director, OWCP,* 943 F.2d 513, 516 (4th Cir.1991).

The enhanced penalty applies to the use of a "deadly or dangerous weapon." Congress did not provide a definition to guide courts in discerning the parameters of this category of items. The first step for the courts thus is to look to the normal meaning of the words Congress employed. *Moskal v. United States,* 498 U.S. 103, 108, 111 S.Ct. 461, 465, 112 L.Ed.2d 449 (1990); *Russello v. United States,* 464 U.S. 16, 21, 104 S.Ct. 296, 299–300, 78 L.Ed.2d 17 (1983). The applicable definition that Webster's Third New International Dictionary offers for "deadly" discloses a thing "tending to produce death: productive of death." The applicable definitions for "dangerous" include "exposing to danger" and "able or likely to inflict injury." Black's Law Dictionary offers definitions for both "deadly weapon" and "dangerous weapon." The definition for the former, derived from the Model Penal Code, is:

> Any firearm, or other weapon, device, instrument, material or substance, whether animate or inanimate, which in the manner it is used or is intended to be used is known to be capable of producing death or serious bodily injury.

The definition for the latter is:

> One dangerous to life; one by the use of which a serious or fatal wound or injury may probably or possibly be inflicted. In [the] context of criminal possession of a weapon [it] can be any article which, in circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or other serious physical injury. *People v. Green,* 4 Dept., 124 A.D.2d 725 [1065], 508 N.Y.S.2d 725, 726. What constitutes a "dangerous

---

the parties to discern the matters that come before it without the particular aid of a deadlocked appellate court, especially on an issue such as this one that has a developed jurisprudence in other circuits, I simply note the difference between my view and that of Judge Luttig as to our duties as judges. In my view, our role is to decide the cases before us, and if we cannot do that for whatever reason, we ought not to air

our views. Judge Luttig's view suggests that our duty is to prepare opinions not to guide the lower courts but to inform the higher one, and thus views our opinions more as briefs for the Court than as roadmaps for the courts. While that is one view, it is not my own, and I do not share his concern that we fail our duties by not adding more opinions to the Federal Reporter simply to provide fodder to the Court.

weapon" depends not on [the] nature of the object itself but on its capacity, given [the] manner of its use, to endanger life or inflict great bodily harm. *U.S. v. Bey,* C.A.Ga., 667 F.2d 7, 11.

All these definitions, and likely all other definitions of both "dangerous" and "deadly," focus on the *capability* of an item actually to pose a danger of injury or death to some individual. As adjectives, "deadly" and "dangerous" are typically used to restrict the list of weapons to a particular subset having certain capabilities, viz, the capabilities of causing serious or fatal injury.

Given these meanings to the words Congress chose, I would have no difficulty in stating that a bomb properly can be said to be a "deadly or dangerous weapon." What this case involves, however, is not a bomb. While the plurality opinion describes it at one point as a "dysfunctional" bomb, suggesting a bomb that functions but in an improper manner, and uses in another place the label "inoperative," suggesting it could operate but for some reason did not, the most accurate label for Hamrick's device would be "incomplete," for it lacked at least one necessary element to make it work, an effective igniter. However ingenious Hamrick's invention, I do not see how this assembly of batteries, wires, lip balm and lighters can be labeled a "bomb," when a central element, necessary to its operation, is lacking.[2] Just as plastic explosives consisting wholly of lip balm could not be called "plastic explosives," so too this hodgepodge of materials cannot honestly be called a bomb.

Regardless of in which direction one resolves the question of whether this item properly can be called a "bomb," the focus here is not on whether the device is or is not a *bomb* but rather on whether it is or is not a *deadly or dangerous weapon*, every definition of which focuses on a capability for inflicting injury or death. As the testimony of Hamrick's expert demonstrated vividly at trial, there appears to be no possibility, given the inert nature of the igniter material Ham-

rick chose to utilize, that this item posed the slightest threat to anyone. While the plurality opinion dramatically relates that upon being opened, "[t]he bomb scorched the packaging in which it had been mailed, but did not detonate," the scorching was the result of the application of the electric current from the batteries to the pad of paper and was so slight that it was invisible to the naked eye. This in itself was a mistake, since the electric current properly should have affected not the paper pad but the lip balm, which, of course, is an inert substance that will not ignite, its designated function. Whatever appellation is given to this assembly of materials, it held no threat of deadly or dangerous harm to anyone. This being the case, a facial reading of the statute, giving its words their normally understood meaning, suggests that an incomplete bomb such as the one here involved does not fall within the scope of the statute's penalty enhancement provision.

Nor does the legislative history of this statute alter this conclusion. The particular statute in question was first enacted in 1934 as an attempt to penalize comprehensively action against a federal officer in the course of official duties. Pub.L. No. 73–230, 48 Stat. 780 (1934). The House and Senate reports accompanying the legislation do not disclose any Congressional intent on the question of the parameters of the weapons that subject a defendant to sentence enhancement; the House report simply states, opaquely: "If a dangerous weapon is used in the commission of any such offense the penalty is increased." H.R.Rep. No. 1455, 73d Cong., 2d Sess. 1 (1934).[3] The legislative history does, however, provide clear indications as to the antecedent legislation on which this statute was based. In a letter from the Attorney General to the chairmen of the House and Senate judiciary committees, reprinted in both committees' reports, General Cummings states:

> I wish again to renew the recommendation of this Department that legislation be enacted making it a Federal offense forcibly

---

**2.** Of course, the fact that Hamrick's prior attempts to construct an incendiary device were successful, related in detail in the majority opinion, has no bearing on whether this particular attempt was successful.

**3.** The floor debate on the bill also fails to provide any guidance.

to resist, impede, or interfere with, or to assault or kill, any official or employee of the United States while engaged in, or on account of, the performance of his official duties. Congress has already made it a Federal offense to assault, resist, etc., officers or employees of the Bureau of Animal Industry of the Department of Agriculture while engaged in or on account of the execution of their duties (sec. 62, C.C.; sec. 118, title 18, U.S.C.); to assault, resist, etc., officers and others of the Customs and Internal Revenue, while engaged in the execution of their duties (sec. 65, C.C.; sec. 121, title 18, U.S.C.); to assault, resist, beat, wound, etc., any officer of the United States, or other person duly authorized, while serving or attempting to serve the process of any Court of the United States (sec. 140, C.C.; sec. 245, title 18, U.S.C.); and to assault, resist, etc., immigration officials or employees while engaged in the performance of their duties,(sec. 16, Immigration Act of Feb. 5, 1917, c. 29, 39 Stat. 885; sec. 152, title 8, U.S.C.). Three of the statutes just cited impose an increased penalty when a deadly or dangerous weapon is used in resisting the officer or employee.

*Id.* at 2; S.Rep. No. 535, 73d Cong., 2d Sess. 1 (1934). Notably, there is no reference to the legislation contemporaneously being considered by Congress involving bank robbery, which the plurality opinion borrows for use in this instance. *See* part II, *infra.* A review

of the three prior statutes mentioned in the Attorney General's letter that include penalty enhancements for use of a deadly or dangerous device, as well as their committee reports and floor debates, also provide little or no guidance on the question of the reach of those terms.[4] Thus, nothing in the legislative history of this statute or its direct legislative precursors suggests that the statute should be read to encompass items that do not fall within the plain meaning of the terms "deadly" or "dangerous." Given the clarity of the terms Congress utilized, and the absence of any indication from a valid source of legislative history suggesting that the terms are pregnant with meaning beyond that with which they ordinarily are imputed, I would hold that an incomplete, inert "bomb" does not fall within the boundaries of the phrase "deadly or dangerous weapon."

## II

Until this point the plurality apparently does not disagree, for it passes silently over the questions of the plain meaning and legislative history of § 111(b). Instead, it reaches out to find guidance in the legislative history and jurisprudence of another statute that includes the similar, but not identical, language "dangerous weapon or device." Not every statute of similar phraseology can cast light into the void of the subject provision, and courts approach this task with care, for similarity in language may mask dissimilarity

4. For example, the report that accompanied the statute prohibiting assault on an employee of the Bureau of Animal Industry, with a sentence enhancement for use of "any dangerous or deadly weapon" in the process, Pub.L. No. 58–229, § 5, 33 Stat. 1264, 1265 (1905), states:

Imposing a heavy penalty for an assault or attack with a deadly weapon upon an inspector of the Bureau of Animal Industry while said inspector is engaged in the performance of his official duty. This provision is very necessary. During the past year two vicious, deadly, and unprovoked assaults have been made upon inspectors engaged in the performance of their official duties, and it was found that no statute existed under which the perpetrators could be proceeded against in the Federal courts. This is provided for in section 5 of the proposed bill.

H.R.Rep. No. 4200, 58th Cong., 3d Sess. 5 (1905); *see also* S.Rep. No. 4352, 58th Cong., 3d Sess. 4 (1905). If anything, the language con-

cerning "vicious, deadly" assaults merely confirms the idea that Congress, in acting, had in mind scenarios in which actual deadly force was involved, an approach that is in harmony with the normal meaning of the words chosen, as discussed *supra.*

The 1909 revision of the criminal laws similarly discussed this matter, but only in the vaguest way. The revision statute recodified the Animal Industry bureau employee provision as well as the Customs or Internal Revenue employee provision. Pub.L. No. 60–350, §§ 62, 65, 35 Stat. 1100 (1909). While it slightly revised the language of each statute (omitting "who discharges any deadly weapon" as surplusage to the "use any deadly or dangerous weapon" language), the report and floor debate fail to discuss the operative terms "deadly" or "dangerous" whatsoever. *See* 42 Cong. Rec. 857–59 (Jan. 20, 1908) (floor debate with a reprinting of the relevant excerpts from the committee on the revision of the penal laws of the United States).

in circumstance, purpose, or historical meaning. Bearing in mind the dangers that can result from an uncritical borrowing, and thus applying heightened scrutiny to the task at hand, it is my belief in this case that the statutes themselves are so dissimilar, as the legislative history and the jurisprudence disclose, that the second statute sheds no light into the void of the first.[5]

The helping statute that the plurality opinion relies upon is the federal bank robbery statute, 18 U.S.C. § 2113. Under subsection (d) of that provision, anyone who "puts in jeopardy the life of any person by the use of a dangerous weapon or device" is eligible for a sentence enhancement. *Id.* § 2113(d). In *McLaughlin v. United States*, 476 U.S. 16, 106 S.Ct. 1677, 90 L.Ed.2d 15 (1986), the Supreme Court construed the "dangerous weapon" language of the statute to encompass an unloaded gun used in the commission of a bank robbery. The plurality opinion now relies on that opinion's analysis, which offered three reasons in three sentences, as controlling precedent for this case.[6]

As a general matter, I simply disagree with the plurality's initial assumption that the appearance of the word "dangerous" in both statutes indicates that word must be given the same meaning in each. As Justice Holmes pellucidly stated:

A word is not a crystal, transparent and unchanged; it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.

*Towne v. Eisner*, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918); *see also R.A.V.*

*v. St. Paul*, —— U.S. ——, —— & n. 5, 112 S.Ct. 2538, 2566 & n. 5, 120 L.Ed.2d 305, 346 & n. 5 (1992) (Stevens, J., concurring). Thus, it is not enough to say that the same operative word is present in the two statutes; we must instead focus on the contextual setting of the statutes and determine whether the construction of one informs that of the other.

The first reason the Court offered to support its conclusion that an unloaded gun is a "dangerous weapon" under § 2113(d) was that "a gun is an article that is typically and characteristically dangerous." *McLaughlin*, 476 U.S. at 17, 106 S.Ct. at 1678. I agree with the plurality opinion that this prong of *McLaughlin* applies equally in determining whether an item constitutes a "deadly or dangerous weapon" under § 111(b); however, I disagree with the specific application here.

The question necessary for decision of this case is not, as the plurality opinion posits, whether "a bomb is typically and characteristically dangerous," because the item with which we are dealing, as noted above, *see* Part I *supra*, simply cannot be labeled a bomb. To say that all bombs are typically and characteristically dangerous, and that this is a bomb, and therefore that this item is typically and characteristically dangerous, focuses on labels to the detriment of reality. A completed device that contains an inert necessary element that thwarts its operation simply cannot be called a "bomb" any more than a device with no barrel or made entirely out of straw could be called a "gun." Even if we were to call it a "bomb" or "gun," however, the question of whether such items still fit

---

**5.** Although the original versions of what are now § 111(b) and § 2113(d) were passed contemporaneously, the legislative history of § 111(b) makes clear that it was directly based on antecedent legislation that can be traced as early as 1905. Given this fact, I am somewhat skeptical of the validity of "borrowing" any construction of § 2113(d) based on its legislative history. In addition, I note that the legislative history *McLaughlin* relied upon is not a committee report but rather a brief colloquy among members of the House during the floor debate, a form of legislative history that has fallen into disfavor for purposes of statutory construction. *Conroy v. Aniskoff*, —— U.S. ——, —— n. 2, 113 S.Ct. 1562, 1568 n. 2, 123 L.Ed.2d 229, 239 n. 2 (1993) (Scalia, J., concurring); *Coalition for Clean Air v.*

*Southern Calif. Edison Co.*, 971 F.2d 219, 227 (9th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1361, 122 L.Ed.2d 740 (1993); *International Bhd. of Elec. Workers, Local 474 v. NLRB*, 814 F.2d 697, 717 (D.C.Cir.1987) (Buckley, J., concurring). Whatever the value of such remarks in construing the meaning of the bill being discussed, it is all the less valuable in shedding light onto the meaning of other legislation not being considered in the debate.

**6.** The plurality does not rely on *McLaughlin*'s third justification, that an unloaded gun can be used as a bludgeon. Given the unwieldy group of items here, including batteries, wires, lip balm, and lighters, I agree that that justification is inapplicable.

within the subset "typically and characteristically dangerous" must be revisited anew. While syllogistic reasoning has its place, once one of the syllogism's premises is altered the validity of the conclusion is thrown into doubt. In the end, I simply believe that incomplete bombs are more similar to incomplete or faux guns than they are to unloaded guns, and that invocation of the first *McLaughlin* justification does not decide this matter.

It is with the second *McLaughlin* justification that the statutes clearly diverge. Under the bank robbery statute, "the display of a gun instills fear in the average citizen; *as a consequence, it creates an immediate danger that a violent response will ensue.*" *Id.* at 17–18, 106 S.Ct. at 1678 (footnote omitted) (emphasis supplied). While the plurality opinion discusses extensively the first half of the justification, involving the possibility that a bomb will instill fear, it devotes much less space to explaining how the opening of a bomb sent through the mail "creates an immediate danger that a violent *response* will ensue." I think it clear that the focus of the dangerousness in § 2113(d) is on the presence of an immediate danger of violent "response" (*not* "reaction"); this is confirmed by the surrounding language in the statute, penalizing more heavily anyone who "*puts in jeopardy* the life of any person *by the use of a dangerous weapon or device.*" (Emphasis supplied.)[7] Of course, in this instance, involving a letter bomb opened in a secure government office, the immediate danger of violent response is negligible, given the absence of the wrongdoer from the scene. The plurality opinion concedes this point

("[W]here, as here, the weapon has been mailed ... there is little risk of retaliation against the sender which would endanger those involved."), but then asserts that "there is still an immediate danger of injury to those who flee or otherwise furiously react to the perceived threat to their lives, and to innocent bystanders." While it is true that innocent bystanders may be injured during any reaction based on fear, this rule certainly reaches too far. The plurality opinion deftly changes the focus from *response to* the wrongdoer to *reaction against* the present danger, which, I submit, was not the approach within the statute's, or the Court's, contemplation. Not only would this sweep within its ambit the sending of real bombs or incomplete bombs, but also would reach any item, tangible or intangible, that causes or has the potential to cause some reaction that could cause harm. If Hamrick had phoned in a bomb threat the type of response the plurality opinion posits could result, making a voice a "deadly or dangerous weapon." If he had mailed a letter stating that there was a bomb in the building about to explode, the letter would be a dangerous weapon. In fact, a bodily assault such as a fight often induces those nearby to flee, raising the same possibility of resulting harm. Focusing on the hypotheticals of the type offered by the plurality opinion does not, as far as can be discerned, allow us to determine in any principled way when *not* to apply the enhancement provision of § 111(b). This failure is notable, because an important task for the plurality is to distinguish in some principled way the instances in which a defendant can expect to fall into one sentencing category or the other.[8] I simply think that the plurality's reliance not on direct dangers

7. "[T]he meanings of words depends on their context." *Shell Oil Co. v. Iowa Dep't of Revenue*, 488 U.S. 19, 25, 109 S.Ct. 278, 281, 102 L.Ed.2d 186 (1988). As Learned Hand stated:

 Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used.

 *NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir.1941).

8. As stated in Part I, *supra*, I believe that the language of the statute is sufficiently clear that the exercise in borrowing that the plurality un-

dertakes is unnecessary. Even if the statute is sufficiently unclear to justify this borrowing, however, the plurality opinion's approach does nothing to limit this lack of clarity, and the rule of lenity properly should be applied in this instance. That rule, which applies to "any criminal statute, including a sentencing provision," *United States v. Hall*, 972 F.2d 67, 69 (4th Cir. 1992), is reserved for those situations in which "a reasonable doubt persists about a statute's intended scope even *after* resort to the language and structure, legislative history, and motivating policies of the statute." *Moskal*, 498 U.S. at 108, 111 S.Ct. at 465 (emphasis in original) (internal quotations omitted). It is designed to "ensure both that there is fair warning of the boundaries

brought about by the chance of immediate reaction but rather on tertiary dangers with unclear lines of demarcation stretches too far to reach the desired result.[9]

In the context of a bank robbery, many items can be said to be "dangerous." While some objects are dangerous because of their actual ability to inflict harm, others are dangerous because, even though not in fact able to inflict harm, their apparent ability to do so through immediate use by the present wrongdoer lead to situations that are pregnant with the possibility of an immediate and violent response to resolve the situation. In the context of a federal officer's receipt of a device through the mail, on the other hand, the incomplete bomb was incapable of inflicting harm; and even though there is some possibility that those receiving the device would be frightened by it, there is no analogous scenario of immediate danger of violent response to resolve the situation because there is no wrongdoer present. The term "dangerous" used in the context of bank robbery encapsulates a different set of possibilities than it does in the context of this sort of long-distance assault, with the former reaching significantly further than the latter.

### III

The language of the statute suggests that an incomplete bomb should not be held to come within the scope of the phrase "deadly or dangerous weapon." Nothing in the legislative history of this statute or its antecedents suggests otherwise. Having examined the bank robbery statute and its construction with the cautious and searching approach necessary when borrowing the construction of one statute to add meaning to that of another, I do not believe that the law that has developed in that area resolves the question in this situation, for the statutes vary too widely in circumstance. For these reasons, I dissent.

I am authorized to state that Judge HALL, Judge MURNAGHAN, Judge MICHAEL, Senior Judge BUTZNER and Senior Judge PHILLIPS join this dissent.

---

of criminal conduct and that legislatures, not courts, define criminal liability." *Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 1002, 108 L.Ed.2d 132 (1990). Because neither the statute, nor the plurality's opinion today, provides sufficient fair warning as to the boundaries of the criminal conduct encompassed under § 111(b) in these types of cases, I believe that the rule of lenity properly should be applied in this instance.

9. The plurality opinion marshals an impressive amount of authority in support of its position. In the end, however, none of it is helpful in resolving the particular question that this case poses. Of the authority the plurality cites, two categories of cases emerge. The first group is cited as supporting the idea that even an inoperable bomb can be considered dangerous because it instills fear. But every case cited, see note 9 of the plurality opinion *supra* and accompanying text, involves a *gun*, not a *bomb*. Gun scenarios, which by their very nature require the presence of the wrongdoer on the scene, do not assist in understanding whether an incomplete bomb mailed from a jail is a dangerous weapon. The second group is cited as supporting the proposition that every circuit court dealing with a fake weapon or with no weapon at all, but rather the assertion that a weapon was present, have reached the same result as the plurality. But almost every case cited, see note 10 *supra* of the plurality opinion and accompanying text, deals with a case involving a bank robbery under § 2113(d). Again, in those cases the presence of the wrongdoer is a necessary factual element and the brandish of a gun or other weapon results in an environment of danger to those present because of the chance for an immediate and violent response very different than that involved in the mailing of an incomplete bomb to a government office. While all these cases would help in determining whether a bomb or pseudo-bomb falls within the "dangerous weapon or device" language of the bank robbery statute, or whether an *actual, operable* gun or bomb fall within the "deadly or dangerous weapon" language of the assault statute, they simply do not advance our understanding of what Congress intended in the instant circumstances.